UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


UNITED STATES OF AMERICA   )          Docket Number
                           )          4:09-CR-17-HLM
                           )
            v.             )
                           )          Rome, Georgia
JEFFREY BRIAN NICKEL       )          September 29, 2009
                           )
                           )


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE HAROLD L. MURPHY,
UNITED STATES DISTRICT JUDGE


APPEARANCES OF COUNSEL:

For the Government:        MS. ELIZABETH McBATH
                           MR. PAUL JONES
                           ASSISTANT UNITED STATES ATTORNEYS
                           600 U.S. Courthouse
                           75 Spring Street, S.W.
                           Atlanta, Georgia 30303
                           (404) 581-6187
                           Angela.Walker@usdoj.gov
                           Yonika.Glover@usdoj.gov

For Defendant:             MR. STEVEN SADOW
                           LAW OFFICE OF STEVEN SADOW
                           260 Peachtree Street, N.W.
                           Suite 2502
                           Atlanta, Georgia 30303
                           (404) 577-1400
                           Steve8300@mindspring.com


Official Court Reporter:   ALICIA B. BAGLEY, RMR, CRR
                           600 First Street, S.W.
                           Rome, Georgia 30161
                           (706) 378-4017

Proceedings recorded by mechanical stenography, transcript
Produced by computer

1                          I N D E X

2

3    Opening Statement by Mr. Jones                6
     Opening Statement by Mr. Sadow               9
4    Closing Argument by Mr. Sadow              151
     Closing Argument by Ms. McBath             160

5


6

WITNESSES:

7

FOR THE GOVERNMENT:

8

LENNY CARR
9        Direct Examination by Ms. McBath         15
         Cross-Examination by Mr. Sadow           71
10       Redirect Examination Ms. McBath         108
         Recross-Examination by Mr. Sadow        112

11
ANTHONY STACK
12       Direct Examination by Mr. Jones         116
         Cross-Examination by Mr. Sadow          144
13       Redirect Examination Mr. Jones          150
         Recross-Examination by Mr. Sadow        151

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

[In Rome, Floyd County, Georgia; September 29, 2009;

10:00 a.m.; in open court; defendant present]

THE CLERK:  Please come to order and be seated.

THE COURT:  Good morning everybody.  I'll sound the case of the United States of America against Jeffrey Brian Nickel.

Is the Government ready?

MS. McBATH:  We are, Your Honor.  Elizabeth McBath and Paul Jones on behalf of the United States.

THE COURT:  All right.  And Mr. Sadow.

MR. SADOW:  Good morning, Your Honor.  I'm ready to go with the defendant.

THE COURT:  All right.  In this case the defendant and his counsel have waived a jury trial.  The Government has waived a jury trial.  The Court has to determine if the waiver of a jury trial is knowing and voluntary by the defendant in this case.  So I'll have to talk with you about this waiver a little bit, Mr. Nickel.

First, Mr. Sadow, have you talked about the difference between a jury trial and non-jury trial with your client?

MR. SADOW:  I have, Your Honor.

THE COURT:  Do you feel confident that he understands the difference?

MR. SADOW:  I do, Your Honor.

1          THE COURT:  And are you confident that he -- from your

2    standpoint, that he's made a knowing and voluntary decision?

3          MR. SADOW:  Yes, sir.

4          THE COURT:  Thank you.

5          How about the Government, is there any reason that

6    either of you Assistant United States Attorneys have any question

7    as to the competency and ability of the defendant to waive a jury

8    trial?

9          MS. McBATH:  No, sir, we don't have any questions.

10          THE COURT:  All right.  Well, I still must discuss this

11    matter a little bit with Mr. Nickel.

12          Mr. Nickel, you understand that a jury consists of 12

13    people in your case, if you were tried by a jury, do you not?

14          THE DEFENDANT:  I understand, Your Honor.

15          THE COURT:  And do you also understand that you would

16    have the right to participate in the selection of the jury?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  And do you also understand that the jury

19    would have to agree unanimously that you were guilty beyond a

20    reasonable doubt before you could be found guilty?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  What is your educational background?

23          THE DEFENDANT:  I have a master's degree and have been

24    working towards a Ph.D.

25          THE COURT:  And what kind of employment have you had

1  through the years?

2          THE DEFENDANT:  I've engaged in corporate training,

3  computer sales, and educational training.

4          THE COURT:  All right.  Do you understand now that if

5  the Court approves the waiver of a jury trial in this case, that if

6  I make a finding that you have voluntarily and knowingly waived a

7  jury trial in this case, that that's binding on you?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And that the decision will be made by me, as

10 the Court, alone as to whether or not you're guilty or not guilty?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Are you comfortable with that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  The Court finds that the

15 defendant in this case, Mr. Nickel, has knowingly and voluntarily

16 waived his right to a trial by jury, that counsel for the parties

17 have also appropriately waived that right, and the Court will

18 approve the waiver and proceed with the case as a non-jury case.

19 I'll enter a written order to that extent.

20         Do either of you want the rule of sequestration?

21         MR. JONES:  Yes, Your Honor, the Government invokes it.

22         THE COURT:  All right.  Any witnesses in the room other

23 than, of course, the case agent and the defendant would have to

24 retire from the room.  And I request that counsel instruct your

25 witnesses as to the rule of sequestration.

1          MR. JONES:  Yes, Your Honor.

2          THE COURT:  Do you want to make an opening statement on

3   behalf of the Government?

4          MR. JONES:  Yes, Your Honor.  It's going to be very --

5   given the nature of the proceeding, it should be very brief, just

6   to outline what the Government's going to put forward.  We do

7   anticipate this is going to be a very, very short trial.  One

8   reason for that is that the Government, Mr. Sadow and Mr. Nickel,

9   have signed a stipulation that cover a lot of the background

10  information in this case.  Specifically that Mr. Nickel during the

11  relevant time period in this case used the screen names

12  Jeffinsonoma77 and Jeffinnorthbay and used those names to

13  communicate via the internet with two undercover agents who were

14  posing as 14-year-old-minor girls.

15         Also the stipulation states that the internet providers

16  used, American Online and Yahoo!, had servers in Virginia and

17  California respectively.  America Online, also known as AOL,

18  operates out of Virginia.  Yahoo! operates out of California.

19  Therefore, that establishes that the communications traveled in

20  interstate commerce when they communicated by computer.

21         Your Honor, in this case the Government's only going to

22  call two witnesses.  The first is Detective Lenny Carr, who is here

23  and who's acting as the case agent.  He is with the Paulding County

24  Sheriff's Department and he was the undercover agent who posed as a

25  minor child using the name Carilee.  The screen name was Carilee94,

1   and he used this name when communicating with Mr. Nickel from April

2   to June until his arrest in Paulding County.  All of that was in

3   2008.

4           Detective Carr was also involved in the arrest of

5   Mr. Nickel, advised him of his *Miranda* rights.  Mr. Nickel chose to

6   waive those rights and to make a statement to Detective Carr and

7   the statement was actually recorded, we intend to put that into

8   evidence as well.  Mr. Nickel admitted at that time that he did use

9   the names *Jeffinsonoma77* and *Jeffinnorthbay* to communicate with the

10  minor child, Cari or Carilee.

11          Detective Carr also obtained a search warrant for the

12  hotel room.  He was staying in Tucker in Gwinnett County for --

13  here on a business trip and found at that point the defendant had

14  in his computer case four condoms.

15          The other witness that the Government's going to call is

16  with the Cook County Sheriff Police Department, and that is

17  Investigator Anthony Stack.  At the same time that Mr. Nickel was

18  communicating with Detective Carr he was also communicating with

19  Investigator Stack who was also posing as a 14-year-old girl using

20  the screen name of *SweetlittlesusyQ*.

21          And, Your Honor, in our 404(b) motion we refer to

22  California evidence where Mr. Nickel was chatting on the internet

23  with a 15-year-old --

24          MR. SADOW:  Excuse me.  I'm going to object.  If you're

25  not going to introduce that evidence, then making reference to it

1  in the opening statement --

2        MR. JONES:  That was my pointing, Your Honor.  Although

3  we refer to it in the 404(b) motion, we do not intend to put on

4  evidence of that and just --

5        THE COURT:  Well, Mr. Sadow's just afraid you're going

6  to prejudice the Court.

7        MR. JONES:  The Court's already aware, because it was in

8  our motion.

9        THE COURT:  He's forgotten that there's not a jury here.

10       MR. JONES:  We are not putting on that evidence, even

11  though we did advise the Court of that.  One reason -- and just to

12  make it clear, we didn't want to just throw it out there is to --

13  in order to effectively present that evidence, we would have had to

14  call in the mother of the 15-year-old, which would have been an

15  emotional ordeal for her, and so we decided not to do that.  We do

16  we feel our case is very strong with the evidence we're putting

17  forward, two chats taking place simultaneously.

18       So the bulk of our evidence is going to consist of these

19  chats, the communications, the internet communications between

20  Mr. Nickel and the two undercover agents.  And I do alert the Court

21  that these chats contain, you know, very graphic descriptions of

22  sexual acts and vulgar language that Mr. Nickel used in his

23  communication with the undercover agents.  The Court will, I'm

24  sure, note the striking similarity between the two sets of chats,

25  especially Mr. Nickel's repeated statements of his desire to engage

1  in sexual relations with each of the supposed minor girls.

2          In addition, Your Honor, we're presenting two notebooks

3  and hope to put those into evidence.  Each notebook will contain

4  all of the chats in their entirety.  But also there are sections

5  within that of highlighted chats which the Government believes

6  shows Mr. Nickel's intent to induce the supposed minor girls to

7  engage in illegal sexual conduct.

8          And then Mr. Johnston has informed us the Court wishes

9  to have us file briefs at the conclusion of the trial and the

10  Government's going to be principally relying on the highlighted

11  portions of those chats to show that Mr. Nickel is in fact guilty

12  of the offense that he's been charged with in federal court.

13          THE COURT:  All right.  Thank you.

14          Mr. Sadow.

15          MR. SADOW:  Good morning again, Your Honor.

16          THE COURT:  Good morning.

17          MR. SADOW:  Just as an aside, you know, it's 30 years

18  this coming month that you swore me in.

19          THE COURT:  Yeah, I was thinking about that.  It was 30

20  years ago that you were up here following Mr. Garland around

21  waiting to get admitted to the bar.

22          MR. SADOW:  That's exactly right.

23          THE COURT:  While we were trying that famous case.  You

24  got a good education out of that.

25          MR. SADOW:  Ten years' worth in probably 10 weeks.

1           THE COURT:  Yes.

2           MR. SADOW:  Your Honor, our position -- I will also be

3  brief, but our position is very succinct and concise here.  We are

4  not challenging the conduct.  The conduct that the Government is

5  going to introduce is not being challenged in any way, and we are

6  accepting responsibility for the conduct.

7           The issue that we're asking the Court to consider and

8  make a determination on is whether this conduct violates the

9  specific statute that the defendant is charged with.  We are

10 readily accepting that there are other statutes under the United

11 States Code that we violated.  The Government, however, sought to

12 charge only a violation of 18 USC 2422, Subsection (b).  And I

13 think it will become clear that the reason for that is 2422(b)

14 carries a 10-year mandatory minimum sentence whereas other

15 statutes, for which we would have readily acknowledged and entered

16 a guilty plea, do not carry a mandatory minimum sentence.

17          Now, having said that, I'd like to focus the Court's

18 attention on the specific provisions of 2422 that we are suggesting

19 won't be shown beyond a reasonable doubt.

20          The language that we're talking about here -- and the

21 Court can easily see it in the one-count indictment in this case --

22 is that there is an attempt to persuade, induce, entice, and coerce

23 essentially a minor to engage in sexual activity.  Our position is

24 that you must have something that goes beyond the mere

25 communication or discussion about engaging in sex.

1        And I don't mean it in the sense of that the Government

2   won't be able to prove that the defendant took more action.

3   There's no question the defendant engaged in sexually graphic

4   conversations online with someone he believed to be under the age

5   of 16, be it 14 or 15, depending on the time period, but clearly

6   under the age of 16; that the defendant came to Georgia and in fact

7   went to the location where he believed the minor would be and at

8   that time was arrested by law enforcement, there's no question

9   about that.

10        So we're not suggesting that the statute -- that he

11   stopped and didn't have to travel.  When you look at the case law,

12   you'll see that that is almost always the issue, the defendant

13   actually traveled.  I'm suggesting the statute is not focused on

14   the travel, but that's not the attempt.  The attempt is to

15   persuade, induce, entice, or coerce.

16        I would pose this hypothetical.  If the defendant, or

17   anyone else in the defendant's position -- that being someone not a

18   minor, an adult -- were to communicate over the internet by

19   chatroom or email with someone under the age of 18, a minor -- if

20   in that very first conversation the minor said "I'm a minor.  I'm

21   14.  Here 's my ID," emailed a copy of the ID, "I want to have sex.

22   All I want to do is have sex.  Just get in a car and drive to me

23   and we will have sex."

24        And the defendant, whoever it might be, and that minor

25   then conversed about having sex and the defendant then went and met

1   with the minor, he was arrested, I would suggest that that does not

2   violate the statute, because nothing the defendant did was

3   attempting to persuade, induce, entice, or coerce the minor.  The

4   minor was not reluctant.  There was nothing done to persuade,

5   entice, or induce.  That would be the best of all possible

6   examples.

7          He would have violated, again, several other statutes,

8   but not this one, and that is what we're going to be asking the

9   Court to review when you see the chats and the email here, looking

10  for persuasion, the inducement, or enticement.  And I'm suggesting

11  that is what's not going to be shown beyond a reasonable doubt.

12  Not that the conduct isn't there, but it doesn't meet this.

13         Obviously, our hypothetical that I just gave you isn't

14  exactly the situation that we have here or I would have felt a lot

15  more comfortable in just stipulating to a couple of facts.  But in

16  trying to give the Court the focus, that's what we're discussing.

17         Now, to be perfectly candid with the Court, which I

18  think is probably a good idea since I've been appearing before you

19  for 30 years, if at some point in time during the trial the Court's

20  interpretation of the law is essentially I don't think that you

21  have to have anything more than a minor conversing with an adult in

22  order to reach the persuasion or inducement or enticement element,

23  which essentially, I think, is the Government's position -- and I

24  dare say, if the Court will make that known, I'm not going to waste

25  anybody's time.  This is the - this is the real issue.  If that in

1  and of itself is enough, adult discussing, talking with a minor,

2  then we lose, no question we lose and that's the way that the

3  decision would be.  I think it would be wrong under that

4  circumstance, we would be unsuccessful.

5          So, again, I think the statute cannot be read to mean

6  attempt to discuss or attempt to communicate or converse with a

7  minor to engage in sex.  It has to have these elements, one of

8  which proves beyond a reasonable doubt in order to convict, and I

9  don't believe the evidence here will show that.

10          THE COURT:  All right.  Thank you, Mr. Sadow.

11          All right.  Ms. McBath, Mr. Jones.

12          MS. McBATH:  The United States will call Detective Lenny

13  Carr to the stand.

14          Before I do that, Judge, I would like to tender the

15  stipulation as Government's Exhibit 1.

16          THE COURT:  Certainly.

17          MS. McBATH:  I'd like to read that into evidence.

18          THE COURT:  All right.

19          MR. JONES:  Your Honor, if I can just provide a copy of

20  the witness list and the exhibit list.

21          MS. McBATH:  Government's Exhibit 1 reads as follows:

22      "Stipulation.  The United States of America, Defendant

23  Jeffrey Brian Nickel, and his defense counsel do hereby stipulate

24  and agree to the following:

25          (1)  At all times relevant to this case, the Yahoo! screen

1   name 'Jeffinnorthbay77' was registered to, and used by, Defendant

2   Jeffrey Brian Nickel.

3        (2)  The communications through Yahoo!'s Instant Messaging

4   and email services that occurred between Defendant Jeffrey Brian

5   Nickel, who was using the screen name 'Jeffinnorthbay77,' and

6   Detective Lenny Carr, who was using the screen name 'Carilee94,'

7   were electronically transmitted from Defendant Jeffrey Brian

8   Nickel's computer through one or more regional servers to Yahoo!'s

9   master server in the state of California before final delivery to

10  the intended recipient, that is 'Carilee94,' in Paulding County,

11  Georgia, and thus moved through interstate and/or foreign commerce.

12       (3)  At all times relevant to this case, the America Online

13  screen name 'Jeffinsonoma77' was registered to, and used by,

14  Defendant Jeffrey Brian Nickel."  And lastly

15       "(4) The communications through AOL's Instant Messaging and

16  email services that occurred between Defendant Jeffrey Brian

17  Nickel, who was using the screen name "Jeffinsonoma77,' and

18  Detective Lenny Carr, who was using the screen name 'Carilee94,'

19  were electronically transmitted from Defendant Jeffrey Brian

20  Nickel's computer through one or more regional servers to AOL's

21  master server in the state of Virginia before final delivery to the

22  recipient, that is 'Carilee94,' in Paulding County, Georgia, and

23  thus moved to interstate and/or foreign commerce."

24       This stipulation is signed by the defendant, by

25  Mr. Steve Sadow, and by the two Assistant US Attorneys, Paul Jones

1  and Elizabeth McBath.

2           THE COURT:  Thank you.

3           MS. McBATH:  We would move to admit Government's Exhibit

4  1 into evidence.

5           THE COURT:  It's made a part of the record.

6           MS. McBATH:  The United States now calls Detective Lenny

7  Carr.

8                        LEONARD CARR,

9   called as a witness by the Government, after having first been

10  duly sworn, testifies as follows:

11          THE CLERK:  Thank you and be seated.  If you would state

12  your name for the record and please spell it.

13          THE WITNESS:  Yes.  My full name is Leonard James Carr.

14  L-E-O-R-N-A-R-D; J-A-M-E-S; C-A-R-R.

15                      DIRECT EXAMINATION

16  BY MS. McBATH:

17  Q.  Where do you work, sir?

18  A.  I work for the Paulding County Sheriff's Office.

19  Q.  What is your title?

20  A.  Detective.

21  Q.  How long have you been in law enforcement?

22  A.  Approximately five years now.

23  Q.  And what type of law enforcement do you investigate as a

24  detective?

25  A.  Crimes against children.

1    Q.  How long have you specialized in crimes against children

2    cases?

3    A.  Two years.

4    Q.  And what type of training and experience do you have in this

5    particular area?

6    A.  Several - several hundred hours of training in law

7    enforcement, specifically in crimes against children, at least 200

8    hours or more.

9    Q.  Were you the detective working this case?

10   A.  Yes.

11   Q.  Can you -- before we get into the specifics of all the

12   individual chats, can you please provide the Court with a general

13   overview of what you did in this case.

14   A.  Yes.  I began doing what we call undercover chat where I

15   develop a screen name and a persona.  What I did was I went onto

16   America Online, also known as AOL, went into some teen chatrooms,

17   was approached by the defendant.  After several chats and emails,

18   the defendant met me -- met Carilee in Paulding County.

19   Q.  Was the defendant arrested at that point?

20   A.  Yes.

21   Q.  And was he interviewed?

22   A.  Yes.

23   Q.  Now, you just said that as part of this undercover

24   investigation you went into a chatroom.  What is a chatroom?

25   A.  A chatroom is an electronic meeting room similar to if you

1  were in a regular meeting room in this court where a lot of people

2  or a number of people gather and discuss whatever topic is the

3  topic in that chatroom.

4  Q.  Can you also talk privately?

5  A.  Yes.

6  Q.  How does being -- communicating in a chatroom, how does that

7  compare with communicating via electronic mail or email?

8  A.  Email is a little bit slower than realtime, at least most of

9  the time.  Electronic mail, there's a delay in the conversation.

10  Q.  Now, you mentioned that you were in an AOL chatroom.  Is that

11  correct?

12  A.  Yes.

13  Q.  Does AOL have more than one chatroom?

14  A.  Yes.

15  Q.  How are they organized or divided?

16  A.  They're organized by categories and then subcategories of just

17  about virtually any topic you could think of.

18  Q.  And how does one first enter a chatroom?

19  A.  One usually enters a chatroom by having their Instant

20  Messaging box up is one way to do it.  One would then take -- at

21  the top of their Instant Message box there's a pull-down menu that

22  let's you go to what's called a public chat.

23  Q.  Let's back up for a second.  What do you do first?  Do you

24  have to log in?

25  A.  You have to log into your account.

1   Q.   How do you log in?

2   A.   Using a screen name and a password.

3   Q.   Okay.  What is a screen name?

4   A.   A screen name is your online identity that you create, each

5   person.

6   Q.   Did you use a screen name in this case?

7   A.   Yes.

8   Q.   What was your screen name?

9   A.   Carilee94.

10  Q.   Did the defendant use a screen name?

11  A.   Yes.

12  Q.   And what was the defendant's screen name?

13  A.   Jeffinsonoma77.

14  Q.   So you log in using your screen name and then what happens?

15  A.   Once you log in using your screen name in the Instant Message

16  box, you then have several options at that point to communicate

17  with other people, either via chatrooms or also on a buddy list.

18          MR. SADOW:  Your Honor, to make things even easier, I

19  don't believe that any of the exhibits that are going to be sought

20  for admission by the Government are going to be objected to by me.

21  So if they want to just essentially put them in and then go to work

22  with them, that may be the fastest way to --

23          THE COURT:  All right.  Why don't you just put in all

24  your exhibits as you want to now or as we go along, whichever is

25  better for you, Ms. McBath.

1          MS. McBATH:  Okay.  I think I'll put them in as I go

2  along.

3          THE COURT:  All right.  Well, that's fine.

4          MS. McBATH:  I guess I don't need to go through the

5  foundational questions?

6          MR. SADOW:  No.

7          THE COURT:  No.

8          MS. McBATH:  Okay.  And are they all tendered at this

9  point so I don't need to -- I'll tender them as I go.

10          THE COURT:  All right.  I'll admit all of them, unless

11  there is an objection, as you tender.

12          MS. McBATH:  Thank you, Your Honor.

13          May I approach the witness?

14          THE COURT:  Yes, ma'am.  And you don't have to ask to

15  approach the witness.

16          MS. McBATH:  Thank you.

17  BY MS. McBATH:

18  Q.  I'm showing you what's been marked as Government's Exhibits 2

19  and 3.  Can you please tell the Court what Government's Exhibits 2

20  and 3 are.

21  A.  Yes.  Government's Exhibit 2 is a chatroom on AOL Instant

22  Message chat.

23  Q.  And what about Government's Exhibit 3?

24  A.  Government's Exhibit 3 is an Instant Message on AOL Instant

25  Messaging.

1  Q.  And will Government's Exhibits 2 and 3 help you explain how a

2  computer user uses a chatroom?

3  A.  Yes.

4        MS. McBATH:  We would tender Government's Exhibits 2 and

5  3 for demonstrative purposes.

6        THE COURT:  They're admitted.

7  BY MS. McBATH:

8  Q.  Okay.  Detective Carr, directing your attention to

9  Government's Exhibit 2, can you please explain what we're looking

10  at here.  Yes.

11  A.  This is an example of a chatroom in America Online, also known

12  as AOL.  What is in the side here are all the people that are

13  logged into this chatroom by their screen name.

14  Q.  Is this on the left side?

15  A.  Yes, on the left side, the list of names.

16  Q.  Okay.

17  A.  And in the center, the large window is where there is actual

18  conversation going on between the people that choose to converse

19  in this chatroom.

20  Q.  Now, if you look on the left side, you said that you have a

21  list of people who are in the chatroom.  Are these peoples' screen

22  names that are listed?

23  A.  Yes.

24  Q.  And next to their screen name there appears to be a box next

25  to each screen name.  What is that box?

1   A.  That is a box that, if you have it set up in your profile, you

2   can have a picture show up there, a picture of your choosing.

3   Q.  What happens if someone clicks on this picture?

4   A.  Depending on what filters and what restrictions they have on

5   their profile, you may get to see the person's profile.

6   Q.  Did you, posing as Carilee -- did Cari have a profile in this

7   case?

8   A.  Yes.

9   Q.  What did that profile say?

10  A.  I don't recall the exact words of what it said.

11  Q.  Did you have a picture?

12  A.  Yes, there was a picture.

13  Q.  I'm showing you now Government's Exhibit 4.  Can you please

14  explain what we're looking at here.

15  A.  Yes.  This is the picture that was used on the profile for

16  Carilee94 that would have -- this is an example that would have

17  shown up down on the left side.

18  Q.  So if the computer user that was in the chatroom when you were

19  there wanted to view Cari's picture, they could have simply

20  clicked on the picture next to your screen name.  Is that correct?

21  A.  Yes.

22  Q.  And this picture would have come up?

23  A.  Yes.

24          MS. McBATH:  Okay.  Government tenders Government's

25  Exhibit 4.

1          THE COURT:  It's admitted.

2    BY MS. McBATH:

3    Q.  Now, in this case how did you electronically communicate with

4    the defendant?

5    A.  Via computer.

6    Q.  Did you communicate via email?

7    A.  Yes.

8    Q.  And did you communicate via Instant Messaging?

9    A.  Yes.

10   Q.  Directing your attention now to Government's Exhibit 3, what

11   is this?

12   A.  This is an example of an AOL Instant Message, also known as

13   AIM, and this is where the conversation will take place in the

14   large window in the middle.  The box at the bottom is where the

15   person-- for example, if I was chatting with somebody, when I type

16   it's going to show up in here and show me what I'm typing before I

17   hit "Send."

18   Q.  But what is Instant Messaging?

19   A.  It's a form of virtual realtime communication that's done over

20   the internet between two -- actually, it could be two or more

21   people, but mostly between two people.

22   Q.  And do you get to Instant Messaging once you're in a chatroom?

23   So is it that two people in a chatroom can decide to communicate

24   privately?

25   A.  Yes.

1   Q.  And then if they decide to do that, then what you see on

2   Government's Exhibit 3 would be an example of a communication

3   between two people communicating privately?

4   A.  Yes.

5   Q.  I'd like to talk about the specific communications in this

6   case.  On April 17th, 2008 did you enter a chatroom as part of

7   this investigation?

8   A.  Yes.

9   Q.  Which one?

10  A.  I don't recall the name of the chatroom.  It was a

11  teen-oriented chatroom.

12  Q.  And when you say "teen-oriented chatroom," what do you mean?

13  A.  It was a chatroom that was categorized for teens to enter in.

14  Q.  What happened when Cari entered this teen chatroom?

15  A.  There were several Instant Messages that came up from

16  different users.

17  Q.  Did the defendant approach you?

18  A.  Yes.

19  Q.  And then did Cari communicate with the defendant from April

20  17th through June 17th, 2008?

21  A.  Yes.

22  Q.  Where were you, as Detective Lenny Carr, physically sitting

23  when you communicated on the computer with the defendant during

24  the time period April 17th through June 17th?

25  A.  That would be in my office at the Paulding County Sheriff's

1  Office located in Dallas, Georgia in Paulding County.

2  Q.  Is that in the Northern District of Georgia?

3  A.  Yes.

4  Q.  Were you at your desk for all the communications you had with

5  the defendant?

6  A.  Yes.

7  Q.  Via the computer?

8  A.  Yes.

9  Q.  Did you save each of these communications?

10 A.  Yes.

11 Q.  How did you do so?

12 A.  Using screen capture software and also -- part of the chats

13 were also stored on an internet AOL archive tool which saves all

14 of the chat information.

15 Q.  Detective Carr, I am handing you a notebook that is entitled

16 Government's Exhibit 5.  What is this?

17 A.  It's a binder that appears to contain, at least in the first

18 few sections, chat conversations I had with the defendant.

19 Q.  Did you review these before coming to court today?

20 A.  Yes.

21 Q.  And does Exhibit 5, the tab under Exhibit 5, is that a

22 collection of all of the communications that you had on the

23 computer with the defendant?

24 A.  Yes.

25 Q.  And then there are also tabs Exhibits 5A through 5Q.  What is

1  behind these tabs?

2  A.  These are transcribed versions of the chats that took place

3  and they appear to be in large font.

4  Q.  Okay.  And are they placed in chronological order?

5  A.  Yes.

6          MS. McBATH:  The Government would tender the notebook,

7  Government's Exhibit A.

8          THE COURT:  It's admitted.

9          MS. McBATH:  Exhibit 5.

10          THE COURT:  It's admitted.

11  BY MS. McBATH:

12  Q.  I'd like to turn now to Tab 5A, Detective Carr.  What do we

13  see here?

14  A.  An April 17th IM, which stands for Instant Message, chat.

15  Q.  Is this the first time that Cari chatted with the defendant?

16  A.  It's the first date, yes.

17  Q.  Who approached whom first?

18  A.  The defendant approached Carilee first.

19  Q.  And how long did this chat last?

20  A.  Approximately an hour, I believe.

21  Q.  Directing your attention to the top of the chat that appears

22  at -- the first line says, "Very cute."  Are we missing a portion

23  of the chat here?

24  A.  Yes.

25  Q.  Why is that?

1    A.  The screen capture software, when this was actually done, some

2    of the parameters, the settings, weren't proper on there where

3    when there was transcription, there was a lot of copies that were

4    very hard to read and we had to go back and try and locate and

5    blow it up, which we in fact did do.

6    Q.  Did you locate the beginning lines of this chat?

7    A.  Yes.

8    Q.  Okay.  And is that found in Exhibit 5 in the collection of

9    chats?

10   A.  Yes.

11   Q.  Let's go through the highlighted portion here.  The first line

12   the defendant says what?

13   A.  The defendant says, "Cute...very cute."

14       Carilee responds, "Well, thanks.  What about you?"

15   Q.  What was your understanding of what the defendant was

16   referring to when he said, "Cute...very cute"?

17   A.  The picture on Carilee's profile.

18   Q.  And what were you referring to when you said, "What

19       about you"?

20   A.  I was referring to "Thanks.  What about you?" as in what do

21   you look like, because the defendant did not have a picture on his

22   profile.

23   Q.  How did the defendant respond to that question?

24   A.  The defendant supplied a MySpace page.

25   Q.  Now drawing your attention down to the bottom of the page.  At

 1  3:44:52 what does the defendant ask?

 2  A.  The defendant asks, "Can I see?"

 3  Q.  And what was he referring to there?

 4  A.  Some photographs -- some digital images that Carilee had

 5  indicated that she did have, but they weren't downloaded.

 6  Q.  How did you respond when he asked if he could see pictures of

 7  you?

 8  A.  Carilee stated, "I can't download right now."

 9  Q.  Can you read that highlighted portion.

10  A.  Yes.  The defendant then stated, "How can I send you

11       pics of me?"  Excuse me.

12       Carilee responded, "Carilee94@aol.com," which was

13       the email address.

14       The defendant then stated, "Can you send some of

15       you back?"

16       Carilee stated, "Once my sister brings the cam," as

17       in camera, "back home.  Sorry."

18  Q.  Did Cari ask defendant what he did for a living?

19  A.  Yes.

20  Q.  And what did the defendant say?

21  A.  Cari asked the defendant "What do you do?"

22       The defendant responded, "I'm a software training,"

23       as in trainer "for a human resources consulting

24       firm."

25  Q.  Did you verify this?

1   A.  Yes.

2   Q.  Going to the next page, did the defendant send Cari any

3   pictures?

4   A.  Yes.

5   Q.  Can you please read the highlighted portion.

6   A.  Yes.  The defendant stated, "Did you get my pics?"

7        Carilee stated, "No pics.  Where you send them?"

8        The defendant stated, "Your AOL address you gave me."

9        Defendant then stated, "Check your spam folder."

10       Carilee said, "Wow didn't see that cumin."

11       Carilee then stated, "Like the suit pic."

12       Defendant stated, "What do you think of me?"

13       Carilee stated, "Nice, the blue shirt is you."

14       The defendant then stated, "Am I attractive?"

15       Carilee stated, "Definitely."

16       The defendant then said, "Thank you."

17       Then one more line down the defendant said, "Wish

18       I could see more of you," question mark, smiley face.

19  Q.  I'm showing you now, Detective Carr, Exhibit 6 and 7.  Are

20  these the pictures that the defendant sent at that time in the

21  chat?

22  A.  Yes.

23       MS. McBATH:  The Government moves to tender Exhibits 6

24  and 7.

25       THE COURT:  They're admitted.

1  BY MS. McBATH:

2  Q.  Can you please describe for us what Exhibit 6 and 7 are.

3  A.  Exhibit 6 is the defendant wearing a blue dress shirt and a

4  tie just standing getting a picture taken.  Exhibit 7 is what the

5  defendant purported to be him standing with a pair of sweatpants

6  on with pubic hair showing.

7  Q.  Okay.  At the bottom of this page what does the defendant say?

8  A.  "Wish I could see more of you," question mark, smiley face.

9  Q.  How does Cari respond?

10 A.  Cari responded with, "Hope to get more pics this week."

11     The defendant then stated, "Do you have a BF?" which

12     stands in most cases for boyfriend.

13     Cari stated, "No, not right now."

14 Q.  Okay.  At 4:10:04 what does the defendant ask?

15 A.  The defendant asks, "Why do you like older guys?"

16 Q.  And how does Cari respond?

17 A.  Cari responded at 4:10, "Young guys are immature and

18     stupid."

19     The defendant then stated, "LOL," which typically

20     means laugh out loud as an abbreviation and then,

21     "True."

22 Q.  And what does Cari say next?

23 A.  Cari then says -- stated, "Do you like young girls?

24     The defendant then stated, "If they are sexy and

25     know how to handle themselves."

1    Q.   Turning now to the next page, does the defendant ask Cari if

2    she was a virgin?

3    A.   Yes.  At 4:14 the defendant asked Cari, "Are you a

4         virgin?

5         Cari responded, "Yes.  Please don't hold it against

6         me."

7         The defendant then stated, "I don't at all."

8         The defendant then stated, "Many 15 year olds are

9         virgins."

10   Q.   Does the defendant on this page ask about Cari's sexual

11   experience?

12   A.   Yes.  At 4:19 the defendant states, "So you have

13        pretty much done everything else with a guy?"

14        Cari states, "I don't think so."

15        The defendant then stated, "I assume you've kissed,

16        right?

17        Cari stated, "Yes."

18        The defendant stated, "Felt a guy's cock?"

19        Carilee stated, "Yes."

20        The defendant then asked, "Had a guy feel your

21        tits?"

22        Carilee stated, "Slow down.  Make me blush."

23        Carilee then stated, "What's your name?"

24        The defendant said, "Ha ha..sorry hun."

25        Carilee then stated, "Jeff," question mark.

1        The defendant says "I am Jeff."

2        The defendant then asks, "You Carilee?"

3        And Carilee just clarified how Cari is pronounced.

4        it's not Cari.  It's Carrie.  Or, actually, it's

5        not Carrie, it's "Car ee."

6        The defendant then says "Oh," smiley face, "Nice

7        to meet you, Cari."

8   Q.  Turning now to the next page, does Cari ask the defendant if

9   he was married?

10  A.  Yes.  At 4:29 Cari asked the defendant, "How come you're

11       not married?  Or are you?"

12       And the defendant responds, "I'm divorced."

13  Q.  Now, the next page, at 4:31:15.  Did the defendant ever ask

14  Cari where she lived?

15  A.  Yes.

16  Q.  Can you please read the highlighted portion there.

17  A.  Yes.  The defendant asked, "Where are you?"

18       And Carilee responded, "Dallas, Georgia."

19       Carilee then said, "You," question mark.

20       And the defendant stated, "Louisville, Kentucky."

21       Cari then stated, "You seem nice.  Ever get to

22       Georgia?"

23       The defendant says, "Well, I do travel a lot for

24       work."

25       The defendant then asked, "How far are you from

1          Atlanta?"

2          Carilee responded, "Maybe 1/2 hour."

3          The defendant then responded, "I will be in Atlanta

4          for a week in June."

5          Carilee responded, "Cool."

6          The defendant then stated and questioned, "Do you

7          think you could grow to like me?"

8          Cari stated, "If you're as nice in person, yes."

9          And the defendant responded with a smiley face.

10         Following that the defendant stated, "It wouldn't

11         freak you out to meet a guy my age?"

12         And Carilee responded, "No.  I like guys who can

13         talk intelligent."

14         The defendant then says, "Well...I almost have a

15         PhD...LOL," standing for, assuming, laugh out loud.

16         Carilee then stated, "I have to go.  Can we chat

17         again tomorrow?  Mom is home."

18         The defendant stated, "Ok..hope you can get some

19         pics for me soon."

20         And the defendant then stated, "I liked talking to

21         you, Cari."

22    Q.  Okay.  I'd like for you now to turn to Exhibit Tab 5B.  When

23    was the next time that you communicated with defendant?

24    A.  April 21st, 2008.

25    Q.  And was this via Instant Messaging?

1   A.  Yes.

2   Q.  And who approached whom first for this chat?

3   A.  The defendant approached Cari online.

4   Q.  How long did this chat last?

5   A.  I want to say it was more than an hour.

6   Q.  Is it two hours?

7   A.  Approximately, yes.

8   Q.  Now, at the top, the first line we see is a smiley face that

9   the defendant typed in.  Are we missing a portion of this chat?

10  A.  Yes, we are.

11  Q.  And why is that?

12  A.  For the same reason, that the screen capture software was not

13  programmed properly at that time.

14  Q.  Were you able to find the beginning portion of this chat?

15  A.  Yes, I was.

16  Q.  And is a transcription of the beginning portion of this chat

17  found at the end of Tab 5B?

18  A.  Yes, it is.

19  Q.  Okay.  Directing your attention now to the first page of Tab

20  5B.  At 2:14 p.m. Cari says, "Check your email."  What was Cari

21  referring to?

22  A.  Cari was referring to Jeff -- or for the defendant to check

23  his electronic mail.

24  Q.  Why did she want him to do that?

25  A.  Because there were pictures there that she sent that the

1   defendant had requested.

2   Q.  Showing you now Government's Exhibits 11 and 12.  What are

3   these?

4   A.  Those are photographs that purported to be Carilee that were

5   sent to the defendant.

6          MS. McBATH:  Government tenders Exhibits 11 and 12.

7          THE COURT:  Admitted.

8   BY MS. McBATH:

9   Q.  Directing your attention now to the line at 2:15 p.m.  What

10  does the defendant say there?

11  A.  The defendant states at 2:15, "He he..that was a cute

12        look," smiley face.

13        And then followed up with a question, "Do you have

14        more?"

15  Q.  At 2:18 p.m. what does he say?

16  A.  The defendant states, "Ok..sent you two," smiley face.

17  Q.  What was he referring to there?

18  A.  Photographs.

19  Q.  So he sent two photographs to Cari at that point?

20  A.  Yes.

21  Q.  And I'm going to show you what has already been entered into

22  evidence as Exhibits 6 and 7.  Are these the pictures that the

23  defendant sent on April 21st?

24  A.  Yes.

25  Q.  And are these the same pictures that he previously sent Cari

1  on April 17th?

2  A.  Yes.

3  Q.  And is this the picture of the defendant in a blue shirt as

4  well as in sweatpants where a portion of his pubic hair is shown?

5  A.  Yes.

6  Q.  Okay.  Turning now to the next page, can you please read what

7  the defendant said at 2:30 p.m.

8  A.  The defendant stated at 2:30 p.m., "Is it weird that I

9       like it that you are 14?"

10 Q.  What does Cari say?

11 A.  Carilee responds with, "I will be 15 soon."

12      The defendant then states, "You know I am 30,

13      right?"

14 Q.  At 2:34 p.m. what does the defendant say?

15 A.  The defendant stated at 2:34 p.m., "Do you want to

16      see something kinda naughty?"

17 Q.  Does he send a picture there?

18 A.  I believe so, yes.  Yes.

19 Q.  I'm showing you now Government's Exhibits 8 and 9.  Are these

20 the pictures that the defendant sent Cari at that portion of the

21 chat?

22 A.  Yes.

23 Q.  And can you please describe what these pictures show.

24 A.  The pictures are of -- at that time the defendant purporting

25 to be him, as well as the picture of a male, which the defendant

 1  purported to be him, grabbing his groin area with a pair of

 2  sweatpants on.

 3          MS. McBATH:  Government tenders Government's Exhibits 8

 4  and 9.

 5          THE COURT:  They're admitted.

 6  BY MS. McBATH:

 7  Q.  After the defendant sends Exhibits 8 and 9 to Cari, what does

 8  he say at 2:46 p.m.?

 9  A.  At 2:46 p.m. the defendant states, "He he..did you

10       like?"

11  Q.  And your understanding was that he was referring to the two

12  pictures that he just sent?

13  A.  Yes.

14  Q.  Did the defendant ask Cari to send pictures at this point?

15  A.  Yes.  At 2:47 p.m. the defendant said, "Can I see more

16       of you?"

17  Q.  What did he say at 3:00 p.m.?

18  A.  At 3:00 p.m. he said, "I want to see more sexy pics

19       of you," smiley face, "LOL," laugh out loud.

20  Q.  How about on the next page at 3:01?

21  A.  At 3:01 "I've sent you 4 of me.  I've only seen 2 of

22       you..LOL," laugh out loud.

23       And then at 3:03 p.m. he responds with "Sent."

24  Q.  Did he send Cari another picture at this point in the chat?

25  A.  Yes.

1  Q.  I'm showing you now what's been marked as Government's Exhibit

2  10.  Is this the picture that defendant showed Cari at this point

3  in the chat?

4  A.  Yes.

5  Q.  What is that a picture of?

6  A.  The picture of a male torso area that the defendant purported

7  to be his.

8  Q.  And is the male torso area clothed or unclothed?

9  A.  Unclothed.

10        MS. McBATH:  Government tenders Government's Exhibit 10.

11        THE COURT:  Admitted.

12  BY MS. McBATH:

13  Q.  After the defendant sent Cari Government's Exhibit 10, what

14  does he say at 3:05 p.m.?

15  A.  The defendant --

16  Q.  And this portion is not highlighted.

17  A.  The defendant stated at 3:05 p.m., "He he..did you

18        like?"

19  Q.  Okay.  And directing your attention now to 3:06 p.m., and this

20  portion is not highlighted either.  What does the defendant say at

21  3:06 p.m.?

22  A.  The defendant stated, "He he..so I want to see more of

23        you," smiley face.

24  Q.  Turning now to the next page.  At 3:12 p.m. what does the

25  defendant say?

1   A.   The defendant states, "You should take some sexy pics

2        of you for me next time you have a camera," smiley face.

3   Q.   Okay.  Now I'd like for you to flip a few pages over to the

4   chat that takes place at 3:28 p.m.

5   A.   The defendant stated at 3:28 p.m., "So you are a

6        freshman in high school?"  "HS" as in high school.

7        Carilee responded, "I guess.  I hate that word.

8        But, yeah, 9th grade."

9        The defendant said laugh out loud, "LOL...9th

10       grade works."

11       The defendant stated, "Why no boyfriend?  You are

12       very attractive, Cari."

13  Q.   Was sexual experience discussed again?

14  A.   Yes.  At 3:31 p.m. the defendant asked Cari, "Are you

15       a virgin?"

16       Cari stated, "Unfortunately."

17       Cari stated, "Embarrassed."

18       The defendant said, "Why are you embarrassed?"

19       Cari stated, "Didn't think" -- "Didn't think

20       someone like you would want to talk to me because

21       of it.  Not experienced."

22       The defendant said, "Well, just cause you haven't

23       done it, doesn't mean you aren't good at it or

24       couldn't be in the future."

25  Q.   The next page, at 3:38 p.m. what does the defendant ask?

1  A.  The defendant asks, "How far have you gone with a guy?"

2  Q.  Turning now to the next page.  At 3:48 p.m. what does the

3  defendant say, and what is your understanding of this question?

4  A.  The defendant asked, "Are you natural, shaved, or

5      trimmed?"

6    My understanding was that the defendant was referring to

7  pubic hair.

8  Q.  On the next page, at 3:55 p.m. does the defendant ask about

9  pubic hair again?

10  A.  Yes.  At 3:55 p.m. the defendant asks, "So is your

11      pussy nice and hairy?"

12      Cari responds, "Yes, it is hairy."

13      The defendant says, "Mmmm..I love that."

14      Defendant then says, "I'd ask you not to trim it at

15      all if you were my girl," smiley face.

16  Q.  Now, further down the page at 3:58 p.m., will you please read

17  the highlighted portion.

18  A.  Yes.  The defendant states, "How do you like your

19      guys?"

20      Cari states, "I have not been that close to that

21      many guys." --

22      Cari states, "I have not been that close to

23      that many guys.  Closely trimmed sounds good."

24      The defendant then says, "I am 8 inches.  So

25      bigger than most guys."

1          Cari then states, "Wow, that is big.  That might

2          hurt."

3          The defendant says, "I'd be gentle."

4          The defendant then says, "Can I ask bra size?"

5          Cari responded "36C."

6          The defendant then states, "They look really nice

7          in your pics," smiley face.

8    Q.  Now I'd like to turn now in the notebook to Exhibit 5C.  When

9    was the next time that Cari chatted with the defendant?

10   A.  April 23rd, 2008.

11   Q.  Did the defendant ask about pictures during this chat?

12   A.  Yes.

13   Q.  What does he say at 3:49 p.m.?

14   A.  The defendant states at 3:49 p.m., "You should also

15          take more pics of you."

16          Then at 3:53 the defendant says, "Want some more

17          pics," and then another question mark following

18          that up.

19   Q.  Now, did the defendant send Cari more pictures during this

20   chat?

21   A.  Yes, yes.  Where am I at?  I'm getting mixed up.

22   Q.  He asked to see more pictures, but does the chat end shortly

23   thereafter?

24   A.  Yes.  I'm sorry.  I'm looking -- I was looking at the next one

25   down.  No, I'm sorry.

1  Q.  So he did not send any pictures on this day?

2  A.  No.

3  Q.  Now, if we could turn now to Tab Exhibit 5D.  When was the

4  next time that Cari chatted with the defendant?

5  A.  April 25th, 2008.

6  Q.  Directing your attention on the second page at 2:32:46 p.m.,

7  what does the defendant say?

8  A.  The defendant states, "Maybe I'll do some job traveling

9       to Cleveland this summer..LOL," laugh out loud.

10  Q.  Why does he mention Cleveland?

11  A.  Because Cari had mentioned in a previous part of the

12  conversation that she was from the Cleveland area and her father

13  was up there and she may be going to visit there in the

14  summertime.

15  Q.  Okay.  After the defendant says maybe he would do some

16  traveling to Cleveland when she was there, how does Cari respond?

17  A.  Cari responded with, "That would be cool.  Are you

18       still coming to ATL," as in Atlanta.

19       And the defendant stated, "Yes...in June."

20  Q.  What does the defendant say at 2:35:15 p.m.?

21  A.  The defendant stated, "Do you think there's any way

22       you could see me?"

23  Q.  Now flipping a few pages over.  At 2:52:45 p.m. were pictures

24  discussed again?

25  A.  Yes.  At 2:52 the defendant stated, "When will I get

1        more pics of you?"

2   Q.  And at 2:55:34 p.m. please read the highlighted portion.

3   A.  The defendant stated, "Can you take more pics of you?"

4        Cari stated, "If I can get a hold of the camera."

5        The defendant then stated, "Please?"

6        Carilee stated, "I will try."

7        The defendant then stated, "I'd love some sexy

8        pics of you, Cari," smiley face.

9        Cari responded, "The ones I sent weren't sexy?  I

10       hate the way I look on cam," as in camera.

11       The defendant then stated, "Oh, they were sexy..but

12       I mean..would you take a pic of you in just bra and

13       panties?"

14       Carilee responded, "I don't know" -- "I dunno."

15       The defendant then stated, "You don't have to at

16       all.  Just an idea.  You know I'd love it."

17       Carilee stated, "Got to think about that one.

18       Starting to trust you, but you know."

19       The defendant stated, "Yes....I understand,"

20       smiley face.

21       The defendant then stated, "I have an idea."

22       Carilee stated, "Ok."

23       The defendant stated, "Why don't you take some sexy

24       pics...but don't send them to me until you trust

25       me."

1          The defendant then stated, "Because who knows when

2          you'll have your cam again," as in camera.

3    Q.  Okay.  Turning now to the next page.  At 3:25:21 p.m. please

4    read the highlighted portion.

5    A.  The defendant, "Did you get my pics?"

6          The defendant stated, "Cari," question mark.

7          Carilee then stated, "Wow, didn't you see that" --

8          "didn't see that coming.  Don't know what to say."

9    Q.  Let me interrupt you here.  Did the defendant send you two

10   pictures at this point?

11   A.  Yes.

12   Q.  Handing you what's been marked as Government's Exhibits 13 and

13   14.  Are these the pictures that the defendant sent Cari at this

14   time in the chat?

15   A.  Yes.

16   Q.  And what is Exhibit 13?

17   A.  Exhibit 13 is a male nude -- it appears to be fully nude that

18   the defendant purported to be him.

19   Q.  And is that a picture of the defendant's penis?

20   A.  Yes.

21   Q.  How about at Government's Exhibit 14?

22   A.  Government's Exhibit 14 was a picture sent to me by -- sent to

23   Cari by the defendant of a male -- what appears to be an erect

24   penis that the defendant purported to be him.

25          MS. McBATH:  Government tenders Exhibits 13 and 14.

1           THE COURT:  They're admitted.

2   BY MS. McBATH:

3   Q.  When the defendant sent Cari those two pictures, how did Cari

4   respond at 3:28:13 p.m.?

5   A.  Cari responded with "Wow.  Didn't see that comin.

6           I don't know what to say."

7           The defendant then stated, "I thought that's what

8           you wanted," and sad face.

9           And defendant said, "I am sorry if I offended."

10          Cari stated, "No offense taken.  Was surprised."

11          Defendant then stated, "Do you like?"

12  Q.  How about at 3:29:59 p.m., what does the defendant say?

13  A.  The defendant stated, "Do you like my cock, baby?"

14  Q.  Now, on the next page at 3:31:38 p.m. does the defendant ask

15  about Cari's sexual experience again?

16  A.  Yes.  The defendant asks, "You are a virgin, right?"

17  Q.  Does he ask again about her sexual experience?

18  A.  Yes.  At 3:32 defendant asked, "How far have you gone

19          with a guy?"

20  Q.  And how about at 3:33:48?

21  A.  The defendant asked, "I know that...but have you

22          sucked cock?"

23  Q.  Okay.  Now turning a few pages over to 3:51:15 p.m., what does

24  the defendant say?

25  A.  The defendant stated, "Do you think you'd have fun if

1        I taught you for real?"

2   Q.  All right.  When was the next time that Cari communicated with

3   the defendant?

4   A.  I believe that's going to be April 29th, 2008.

5   Q.  Okay.  Is that at Tab 5E?

6   A.  Yes.

7   Q.  Directing your attention to what the defendant says at 1:50

8   p.m.  Does he talk about pictures again?

9   A.  Yes.

10  Q.  What does he say?

11  A.  The defendant stated, "Were you able to take or

12      download any pics?" as in pictures.

13  Q.  And at 1:55 what does Cari say?

14  A.  Cari states at 1:55, "I hid your pics in a special

15      place."

16  Q.  And at 1:58 what does the defendant say?

17  A.  The defendant states at 1:58, "Is that the one of my

18      cock, Cari?"

19  Q.  Can you read the highlighted portion on the next two pages.

20  A.  Cari states, "Oh yeah."

21      The defendant states, "He he..I am so glad you like

22      it.

23      Cari states, "All I can say is wow."

24      The defendant states, "Do you think you'd like to

25      feel it?"

1       Carilee says, "Yea."

2       The defendant states, "How do you want to feel it?"

3       And Cari states, "How do you like it?"

4       The defendant states, "Would you just hold it

5       first...kiss me and take it in your hand first?"

6       Carilee says, "Yea.  Then what?"

7       The defendant says, "Slowly stroke it baby.."

8       The defendant then says, "Feel it throb in your

9       hand."

10      The defendant then says, "As I kiss down your neck...

11      slowly pulling off your shirt."

12      Carilee responds with, "Ok so far!!"

13      Carilee then responds, "Tell me more."

14      The defendant says, "Well, tell me a bit of what you

15      want first, hun."

16      Carilee responds with, "I want to make you happy and

17      will make me happy."

18      The defendant states, "Let me kiss down your neck...

19      down to your tits...taking a nipple in my mouth as

20      my hand slides between your legs."

21      The defendant then states, "Rubbing your pussy over

22      your pants."

23      Carilee responds with, "Ok.  What else?"

24      Carilee then responds with, "So hot."

25      The defendant then responds, "Baby, have you ever

1        sucked cock?"

2        Cari responds, "No.  Willing to try, though."

3        The defendant responds, "I would teach you, Cari."

4   Q.  Those are all the questions I have about that chat.

5           Turning now to Exhibit 5F.  Does Exhibit 5F consist of all

6   of the chats, the Instant Messaging chats, that the defendant and

7   Cari had in May?

8   A.  Yes.

9   Q.  Okay.  What happened on May 1st?

10  A.  On May 1st the defendant attempted to contact Carilee and

11  Carilee was not online.

12  Q.  What about May 2nd?  And May 2nd was inadvertently not

13  highlighted, the date.  What happened on May 2nd?

14  A.  On May 2nd Carilee had noticed that the defendant was trying

15  to make contact, yes, and was responding back, but the defendant

16  was not online.

17  Q.  Is this the first time that Cari tried to contact the

18  defendant first?

19  A.  Yes.

20  Q.  Now, on May 5th, what happens on May 5th?

21  A.  On May 5th Cari goes online, the defendant's not online,

22  there's some question marks.

23  Q.  Were y'all able to communicate on May 6th?

24  A.  Yes.

25  Q.  Who contacted whom?

1   A.  The defendant contacted Cari on May 6th.

2   Q.  Okay.  Drawing your attention to the next page on May 9th,

3   2008.  Generally what does Cari say on May 9th?

4   A.  In general, Cari's explaining that she got in trouble and

5   won't be able to get online for a while from at home.

6   Q.  Why did you do that?

7   A.  Because I got other caseloads -- cases going on at the same

8   time and also was going to be out of town for a while during the

9   month of May.

10  Q.  So after Cari said that she was going to be offline for a

11  while on May 9th -- directing your attention to May 29th, 2008,

12  what happened here?

13  A.  Cari went back online and said, "Hey, miss you.

14      Finally back online.

15  Q.  Did the defendant respond on May 29th?

16  A.  No.

17  Q.  Okay.  When was the next time you communicated via Instant

18  Message?

19  A.  May 30th.

20  Q.  Was the defendant and Cari able to communicate via Instant

21  Message then on May 30th?

22  A.  Yes.

23  Q.  Did he ask --did the defendant ask Cari about pictures again

24  during this chat?

25  A.  Yes.  At 4:21 the defendant asked, "Did you ever get

 1          more pics of you?"

 2   Q.  How about at 4:24:07?

 3   A.  The defendant stated, "I think you should take some

 4          Cute and sexy pics for me, Cari."

 5   Q.  Now, did y'all discuss the defendant traveling to Atlanta?

 6   A.  Yes.  At 4:27 the defendant stated, "I've missed you

 7          so bad, Cari."

 8          Cari said, "Didn't you say before you were coming" --

 9          "Didn't you say you were coming to Atlanta before?"

10          The defendant stated, "Yes!"

11          The defendant stated, "I will be there June 16th

12          through the 20th."

13          The defendant then stated, "I will make time for

14          you."

15   Q.  Now going to the next page.  At 4:37:26 p.m. does the

16   defendant discuss pictures again?

17   A.  Yes.  At 4:37 the defendant says, "What pics did I

18          send you of me?"

19          "Last time hot naked shot" -- I'm sorry

20          Carilee responded, "Last time hot naked shot and

21          one of you holding your thing, mmmm."

22          The defendant then stated, "You liked, baby?"

23          Carilee stated, "Every day.  Email me more?"

24          The defendant then stated, "I'll take some more

25          when I get pics of you."

1          Carilee stated sad face.

2          The defendant stated, "LOL," as in laugh out loud.

3          The defendant then stated, "It's only fair!"

4   Q.  At 4:45:03 p.m. did y'all discuss what would happen when the

5   defendant traveled to Atlanta?

6   A.  Yes.  At 4:45 the defendant stated, "When you see me

7          do you want to go swimming in the hotel pool with

8          me?"

9          And Cari responded, "That would be fun."

10  Q.  How about at 4:52:10 p.m.?

11  A.  The defendant stated, "When I am down there..how will

12         I get" -- "how will you get to me?"

13         Cari stated, "I don't know.  I have to figure that

14         one out.  I have to plan how to get out of the

15         House.  Maybe stay overnight at a friend's.  The

16         rest I don't know yet."

17         The defendant stated, "Ok..I'll rent a car so I can

18         pick you up if you need me" -- "if need be."

19  Q.  And at 4:56:57 p.m. does the defendant talk about what he

20  hoped to do when he saw Cari in person?

21  A.  Yes.  The defendant stated, "I hope you like to kiss

22         for a long time."

23         Then the defendant stated, "Mmm..I want to kiss you

24         all over your body."

25  Q.  How does the conversation end?

1   A.  The conversation ends at 4:59 and the defendant states,

2        "Take pics if you can."

3   Q.  Okay.  Now, we just went through the Instant Messaging that

4   occurred in May of 2008.  Was there also any email communications

5   in May of 2008?

6   A.  Yes.

7   Q.  Okay.  Let's go to Tab 5G, please.  Is this a May 12th, 2008

8   email from defendant to Cari?

9   A.  Yes.

10  Q.  And generally what does the defendant say in this email?

11  A.  He's concerned, you know, why Cari got in trouble.  Also

12  saying that he has not been around because of a brother's wedding

13  and wanted to know when Cari would be able to get back online.

14  Q.  Okay.  You said that the defendant was saying he was concerned

15  that Cari got in trouble.  What was your understanding of this?

16  Can you put this into context of the Instant Messaging that we

17  just heard?

18  A.  That was in relation to when Cari said she was not going to be

19  online for a while was because she got in trouble and that's

20  when-- and that she wouldn't be able to get on Instant Messaging,

21  only be able to check email at the library.

22  Q.  So after Cari said she got in trouble and couldn't check

23  Instant Messaging, the defendant sent this email to her?

24  A.  Yes.

25  Q.  Now, if we could go to Tab 5H.  What is this?

 1   A.  That is an email from Carilee to the defendant.

 2           "Hey, snuck on the computer real quick.  Thanks for

 3           writing.  The school said I was cheating on a test.

 4           I was not.  Called mom in and didn't even let me

 5           explain.  I should be back online by the weekend if

 6           I stay cool.  I will look for you."

 7   Q.  What does the defendant say?  Did he send an email to Cari on

 8   May 15th?

 9   A.  Yes.

10   Q.  And what does he say in his email?

11   A.  He says, "Hey baby!!  How are you?  I haven't seen you

12           online in a while.  Are you still in trouble?  I

13           miss you!"

14   Q.  Okay.  Let's now go to Exhibit Tab 5I.  Was this the next time

15   that Cari and the defendant communicated?

16   A.  Yes.

17   Q.  And what is this?

18   A.  This is an email communication from -- well, first from

19   Carilee and then from the defendant to Carilee.  The message from

20   the defendant to Carilee, part of it states -- reminding Carilee,

21           "Do you remember that the week after next I'll be

22           in Atlanta??  I really want to see you!  Love you,

23           Jeff."

24   Q.  When did this email take place?

25   A.  That would have been on June 6th, 2008.

1   Q.  Okay.  Going to the next tab, Tab 5J.  When was the next time

2   that y'all communicated after the June 6th email?

3   A.  That would have been June 10th, 2008.

4   Q.  And what type of communication was this?

5   A.  This was an Instant Message.

6   Q.  Okay.  In this chat did Cari and the defendant discuss the

7   defendant's trip to Atlanta?

8   A.  Yes.

9   Q.  Can you please read the highlighted portions.

10  A.  At 3:39 the defendant said, "You know next week I'm

11      coming to" -- "I am going to be in Atlanta, right?"

12  Q.  Then on the next page?

13  A.  On the next page at 3:43 Cari states, "K.  I am not

14      good with directions.  Can you Mapquest if I get

15      you the address?"

16      Carilee then states, "K," as in okay, "I will

17      Figure out where we can meet up and get you the

18      address."

19      The defendant states, "Ok."

20      Carilee says, "I'm thinking maybe the Subway nearby

21      might be good?"

22  Q.  How does the defendant respond at 3:46?  And that's not

23  highlighted.

24  A.  The defendant responded with, "That sounds good."

25  Q.  Okay.  Now flip over several pages, please, to what the

1   defendant says at 4:06:43 p.m.

2   A.   The defendant states at 4:06 p.m., "I'll bring condoms,

3        ok?"

4   Q.   And how about at 4:08:19 p.m.

5   A.   The defendant states, "I want to kiss you so bad."

6   Q.   Now please turn to Tab 5K.  What are we looking at here?

7   A.   We're looking at email communication from the defendant to

8   Cari.

9   Q.   And did this email communication occur after the June 10th

10  chat that we just looked at?

11  A.   I'd have to go back and look at it to make certain.  Yes.

12  Q.   And is this an email from the defendant to Cari?

13  A.   Yes.

14  Q.   And what does he say?

15  A.   Wish we could talk more, can't wait to see you next week, and

16  just found out he'll be back in Atlanta in August.

17  Q.   Okay.  Okay.  Going to the next tab, please.  Is this the June

18  11th, 2008 email?

19  A.   June 11th, yes.

20  Q.   And is this an email from Cari to the defendant?

21  A.   Yes.

22  Q.   And what does Cari say in this email?

23  A.   Cari says that -- the Subway address.  She gives the address

24  to the Subway, which is located in Dallas, Georgia, in Paulding

25  County, and then starts to give some directions as far as -- that

 1  she can be at the Subway at a specific time.

 2  Q.  And on the next page what does the defendant -- what is his

 3  response to Cari suggesting they meet at the Subway?

 4  A.  The defendant states, "I looked where I am staying,

 5        and that's like about an hour from me.  I can still

 6        pick you up, but what are we going to do about

 7        getting you home the next day?  I have to be at

 8        work by 8:30 Wednesday morning.  What do you want

 9        me to do, baby?"

10  Q.  Now the next tab, Tab 5M -- and what is Tab 5M?

11  A.  Tab 5M is an email from June 12th, 2008.

12  Q.  And in this email -- is the first email an email from Cari to

13  defendant?

14  A.  Yes.

15  Q.  And in this email did y'all continue talking about defendant's

16  trip to Atlanta?

17  A.  Yes.

18  Q.  Generally what does Cari say in her email?

19  A.  Cari gives some suggestions to the defendant as far as what

20  she could do the following day to get back to the area from

21  meeting with him.  Some ideas as far as where she could go, for

22  example, Six Flags, which is where her friend's sister works and

23  that they were going to go there anyways.

24  Q.  Can you please read the highlighted portion of the defendant's

25  email response on June 12th at 9:21 a.m.

1   A.   The highlighted portion states, "I can give you money

2        for cab fare the next morning, too."

3        And then a little further down, "Do you think you

4        could pay for a cab to come to my hotel, then I'll

5        pay for a cab to get you to Six Flags?  What do you

6        think?  Just might save us some time since you

7        could take a cab while I am still finishing at work

8        and you could meet me at my hotel.  What do you

9        think?"

10  Q.   Was there a followup email on June 12th?

11  A.   Yes.

12  Q.   A second June 12th email.  And that is at Tab 5N, correct?

13  A.   Yes.

14  Q.   Generally what does Cari say in this second email on June 12?

15  A.   After explaining some issues at home with baby-sitting, she

16  states -- and there really isn't any taxicabs in the Dallas,

17  Georgia area, at least at that time, and it probably would cost a

18  lot, even if it did go downtown.  But basically don't feel

19  comfortable taking a taxicab down to the hotel.

20  Q.   And could you please read the highlighted portions of

21  defendant's response.

22  A.   Yes.  On the following page, "I'm afraid I won't get

23       there until like 7ish, then take at least another

24       hour to get back and we won't have any time to see

25       each other.  Can always" -- "Like can always call

```
 1            a cab company to arrange a pick-up at some location
 2            and they will take you anywhere.  I actually could
 3            call the cab company for you, arrange the pick up
 4            and have it prepaid so you don't have to do anything
 5            but get in the cab.  I just hate the idea of
 6            spending 3 plus hours in traffic Tuesday night," sad
 7            face.  "What do you think?"
 8   Q.  Now please go to Tab 5O.  Is this a June 14th email
 9   communication between Cari and defendant?
10   A.  Yes.
11   Q.  Generally what does Cari write on June 14th?
12   A.  "Still crazy here" with the kids.  "Making money
13            baby-sitting."
14            Does not feel comfortable coming to a hotel in the
15            manner that was discussed.
16            "I have to be honest, would feel a little weird
17            just to come meet you at the hotel.  Hope you
18            understand."
19            And also that she was going to Victoria Secret to
20            get the thongs that were previously discussed.
21   Q.  In the defendant's email response, what does the defendant
22   say?
23   A.  The defendant states, "Baby, are you all set to spend
24            the night with me?  Do you have your 'story' set
25            up?  LOL."  I understand that "you don't want to
```

1           show up at a strange guy's hotel" ... "Is there any

2           way that I can pick you up a little closer to my

3           hotel?  I am staying down in Tucker.  Do you know

4           where that is?  What are you going to buy at VS,

5           baby," which is Victoria Secret.  "Will I get to

6           see you in it?  He he...anyway...I can't wait to

7           see you and spend time with you."

8    Q.  Okay.  Now, if we could please go to Tab 5P.  Is this a series

9    of June 16th email communications between Cari and defendant?

10   A.  Yes.

11   Q.  Generally what does Cari say in this email communication that

12   occurred on 11:01 a.m.?

13   A.  She's cleaning houses, states that she believes that the

14   defendant's now in Atlanta, can't figure out, without raising

15   suspicion.  The plan was to walk to "my friend's house."  It's

16   about two miles -- it's about a two-mile walk to Subway.  Stated

17   that she went shopping and also supplied the defendant with a

18   phone number and notified him she'll have to turn it off so she

19   doesn't get -- her mother doesn't get suspicious.

20   Q.  Did the defendant respond at 11:13 a.m. via email on the next

21   page?

22   A.  Repeat the time, please.

23   Q.  11:13 a.m.

24   A.  I don't have an 11:13 a.m. in my book.

25   Q.  Okay.  What do you have in your book?

1   A.  I have June 16th, 2008, 4:41 p.m.

2   Q.  Okay.  Is that an email from Cari to defendant?

3   A.  Yes.

4   Q.  And what does Cari say?

5   A.   "I hope you made it in ok."  Trying to stay out of

6        trouble.

7   Q.  Can you read the highlighted portion.

8   A.  Yes.  "I will start heading to Subway at around 3:30

9        and will be there at 4.  I will be inside where it

10       is cool waiting for you.  Oh yea.  The address is

11       8876 Dallas/Acworth Highway, Dallas, Georgia 30132

12       (next to a Kroger store).  What will you be wearing?

13       What color car?"

14  Q.  What is the next page?

15  A.  The next page is an email from the defendant.  I'm

16       excited, too.  "I will give you a call once I am

17       leaving work."

18  Q.  Can you read the highlighted portion.

19  A.  Highlighted portion?

20       "Also, I don't have to leave here in the morning

21       until about 9:00 on Wednesday.  You also could

22       totally hang out in the hotel until you wanted to

23       leave that morning.  The car I am renting is a

24       silver Chevy Impala" ... "How about I come in

25       Subway, we meet, have a soda and talk for a bit.

1          That sound good?  Then we can take it from there.

2          Hopefully if traffic is good, we'll have plenty of

3          time that night to do whatever we want," smiley

4          face.

5    Q.  Okay.  Now please go to Tab 5Q.  Is 5Q an email from Cari to

6    defendant and another email from defendant to Cari on June 17th,

7    2008?

8    A.  Yes.

9    Q.  And what does the defendant say in his response email?

10   A.  The defendant states, "Should I call you when I'm

11          leaving at 3:00?"

12   Q.  Did the defendant or Cari have any telephone communications?

13   A.  Yes, a brief one.

14   Q.  Just one?

15   A.  Yes.

16   Q.  When did that one telephone communication occur?

17   A.  Just prior to the defendant coming to the agreed meeting

18   place.

19   Q.  So was that June 17th, 2008?

20   A.  Yes.

21   Q.  Was that after this last email on June 17th, 2008?

22   A.  Yes.

23   Q.  And what happened in that telephone call?

24   A.  The telephone call was made in the -- a female detective --

25   I'm sorry.  A female deputy posing as Cari answered the phone and

1   the defendant, the best that I could hear, we did not have a

2   recording device at that time -- the best I could hear, the

3   defendant stated that he was on his way, asked if Cari was scared,

4   and then also said -- nervous, I'm sorry.  Not scared, nervous.

5   Asked if Cari was nervous, and she said, yes, I'm nervous, too.

6           I'll see you in a little while.  I'm leaving now.

7   Q.  And you said this conversation was not recorded, correct?

8   A.  That is correct.

9   Q.  Now I'd like to talk more specifically about what happened on

10  June 17th, 2007.

11          THE COURT:  Let's take a break here.

12          MS. McBATH:  Sure.

13          THE COURT:  We'll take a 10-minute break.

14          THE CLERK:  All rise, please.  This Honorable Court's in

15  recess.

16      [a recess was taken from 11:32 a.m. until 11:48 a.m.]

17          THE CLERK:  This Honorable Court is again in session.

18  Please come to order and be seated.

19          THE COURT:  Whenever you're ready, Ms. McBath.

20          MS. McBATH:  Thank you, Your Honor.

21  BY MS. McBATH:

22  Q.  Detective Carr, I'd like to talk to you now about the events

23  on June 17th, 2008, the day that the defendant and Cari arranged

24  to meet.  Was the defendant arrested that day?

25  A.  Yes.

1  Q.  So can you walk us through please what happened on June 17th,

2  2008.

3  A.  On June 17th, 2008, the agreed meeting place was the Subway on

4  Dallas/Acworth Highway in Dallas, Georgia.  The defendant stated

5  he was going to be showing up in a silver Impala at approximately

6  4:30 p.m.  With several officers set up undercover we observed a

7  silver Impala enter the parking lot and then park right in front

8  of the Subway restaurant.  The subject got out.  All the officers

9  had pictures of what the subject -- the defendant stated was him

10  and the pictures actually matched the suspect that got out of the

11  vehicle to being the defendant.

12  Q.  After he got out of the vehicle, what happened?

13  A.  He was placed under arrest.

14  Q.  After he was arrested, was he interviewed?

15  A.  Yes.

16  Q.  Where was he interviewed?

17  A.  At the Paulding County Sheriff's Office interview room.

18  Q.  How long was the interview?

19  A.  Approximately 30 minutes.

20  Q.  Who was present at the interview?

21  A.  Myself and for, I believe most of the interview, Detective

22  Grim.

23  Q.  Did you read the defendant his *Miranda* rights --

24  A.  Yes.

25  Q.  -- before you interviewed him?

1  A.  Yes.

2  Q.  How did you do that?

3  A.  I read them off a piece of paper that we use.  It's a *Miranda*

4  rights waiver which has the *Miranda* warning on it.

5  Q.  I'm showing you Government's Exhibit 15.  Is this the *Miranda*

6  rights waiver -- rights and waiver that you read to defendant?

7  A.  Yes, it is.

8         MS. McBATH:  Government tenders Government's Exhibit 15.

9         THE COURT:  Admitted.

10 BY MS. McBATH:

11 Q.  And does the defendant sign this?

12 A.  Yes.

13 Q.  And did you sign it?

14 A.  Yes, I did.

15 Q.  Did you read the defendant this exact piece of paper before

16 conducting the interview?

17 A.  Yes, I did.

18 Q.  And these are his *Miranda* rights?

19 A.  Yes.

20 Q.  After you read the defendant what is on Exhibit 15 and after

21 he signed it, did he say that he understood his rights?

22 A.  Yes.

23 Q.  Did he seem to understand them?

24 A.  Yes.

25 Q.  Did he have any questions about his rights?

1  A.  No.

2  Q.  What tone of voice were you using during the interview?

3  A.  Just a normal tone of voice.  Non-threatening.

4  Q.  Did you threaten the defendant in any way to get him to waive

5  his rights?

6  A.  No.

7  Q.  Did you promise him any benefit to get him to waive his

8  rights?

9  A.  No.

10  Q.  Was anyone else ever present at the interview besides you,

11  Detective Grim, and the defendant?

12  A.  No.

13  Q.  Did you have your gun on you during the interview?

14  A.  I believe I did; concealed under my shirt.

15  Q.  Did you ever draw your gun on the defendant at any point?

16  A.  No.

17  Q.  Did Detective Grim ever draw her gun on the defendant at any

18  point during the interview?

19  A.  No.

20  Q.  Did you ever threaten the defendant at any point during the

21  interview?

22  A.  No.

23  Q.  Did Detective Grim?

24  A.  No.

25  Q.  Did you ever make defendant any promises at any point during

1   the interview?

2   A.  No.

3   Q.  How about Detective Grim?

4   A.  No.

5   Q.  Did the defendant ever ask to go to the bathroom during the

6   interview?

7   A.  No.

8   Q.  Did he ask to take a break?

9   A.  No.

10  Q.  Did he ask for food or water?

11  A.  No.

12  Q.  As a police officer, have you ever dealt with people who are

13  under the influence of drugs, medicines, or intoxicants?

14  A.  Yes.

15  Q.  Did the defendant appear to be under the influence of drugs,

16  medicines, or intoxicants?

17  A.  No.

18  Q.  Based on your observation, was there anything about

19  defendant's behavior that made you believe that he was not

20  thinking clearly or logically?

21  A.  No.

22  Q.  Did he appear to understand you?

23  A.  Yes.

24  Q.  Did he speak to you voluntarily?

25  A.  Yes.

1  Q.  Was this interview recorded?

2  A.  Yes.

3  Q.  I'm showing you Government's Exhibit 16.  Is this the DVD of

4  the interview with the defendant?

5  A.  Yes.

6  Q.  And are those your initials?

7  A.  Yes.

8          MS. McBATH:  Government tenders Government's Exhibit 16.

9          THE COURT:  It's admitted.

10 BY MS. McBATH:

11 Q.  During the course of the interview did the defendant admit to

12 using the screen name Jeffinsonoma77?

13 A.  Yes.

14 Q.  Did he say that he showed up because he wanted to meet Cari?

15 A.  Yes.

16 Q.  Did he say that he thought it would be rude if he stood Cari

17 up?

18 A.  Yes.

19 Q.  Did he admit to saying sexual things to Cari?

20 A.  Yes.

21 Q.  During the course of this interview did you show the defendant

22 a photograph that he sent to Cari during their email

23 communications --

24 A.  Yes.

25 Q.  -- and Instant Messaging communications?

1  A.  Yes.

2  Q.  Did the defendant initial these photographs?

3  A.  Yes.

4  Q.  And in initialing these photographs, did he admit that he was

5  the one that sent these pictures to Cari?

6  A.  Yes.

7  Q.  Did he admit to sending all the pictures to Cari that you

8  showed him?

9  A.  Yes.

10  Q.  Let me show you Government's Exhibits 17 through 20.  What are

11  Government's Exhibits 17 through 20?

12  A.  These are printed pictures that I presented the defendant

13  during the interview and reviewed with him, asked him to initial

14  that they were - they were the pictures that he had sent to Cari.

15  And then the very last one, which is part of Exhibit 20, which is

16  the -- what appears to be a male holding an erect penis with two

17  hands.  Although it was acknowledged that it was sent to me from

18  the defendant, he stated that that was not him.

19  Q.  Did he say who that was?

20  A.  Yes.  He stated it was his brother, and I believe he said he

21  stole it off his brother's computer.

22  Q.  Did he say why he took his brother's picture?

23  A.  Yes.  He stated that he thought -- I believe, without

24  verbatim, stated that he thought it would look better online,

25  larger.

1        MS. McBATH:   Government tenders Government's Exhibits 17

2   through 20.

3        THE COURT:   Admitted.

4   BY MS. McBATH:

5   Q.  After the defendant was arrested, what happened to his car?

6   A.  It was impounded.

7   Q.  What, if anything, was found inside the car?

8   A.  There were Mapquest printouts from locations -- I believe it

9   was the airport to the defendant's hotel; the defendant's hotel to

10  his place where he was working; and also from the defendant's, I

11  think, place of work to the location where he was meeting Cari.

12  Q.  I'm going to show you now Government's Exhibits 21, which

13  includes 21A through 22E.  Are these the Google maps that you

14  found in defendant's car?

15  A.  Yes.

16  Q.  You can take those out of the sleeve.  In looking at

17  Government's Exhibit 21A, what is written at the top of that

18  Google map?

19  A.  It's handwritten "Hotel to work."

20  Q.  How about 21B?

21  A.  21B states "Work to Cari"; 21C states "Cari to hotel"; 21D

22  states "Hotel to airport"; 21E states "Work to hotel."

23        MS. McBATH:   Government tenders Government's Exhibit

24  12 -- I'm sorry.  Government's Exhibit 21, which includes Exhibits

25  21A, B, C, D, and E.

1        THE COURT:  They're admitted.

2    BY MS. McBATH:

3    Q.  Detective Carr, was the defendant's hotel room searched as

4    well?

5    A.  Yes.

6    Q.  Was the computer -- was the defendant's computer found in his

7    hotel room?

8    A.  Yes.

9    Q.  Was it searched?

10   A.  Yes.

11   Q.  Was anything found on that computer?

12   A.  Yes.  But the person could not be identified that was --

13   MySpace material that was found.

14   Q.  Were any of the chats found?

15   A.  No, they weren't.

16   Q.  Were any photographs found?

17   A.  No.

18   Q.  What, if anything, was found in his hotel room?

19   A.  A computer.  There was -- obviously there was a -- I believe

20   it was a suitcase with some clothes and there was a laptop on the

21   table and below the table, it's like a desk in the hotel room, was

22   a laptop bag.

23   Q.  Was anything found in the laptop bag?

24   A.  Yes.

25   Q.  What?

1   A.  Condoms.

2   Q.  I'll show you now Government's Exhibit 22.  Do you recognize

3   these?

4   A.  Yes.

5   Q.  What are they?

6   A.  Those are the condoms that I found in the laptop bag.

7          MS. McBATH:  Government tenders Government's Exhibit 22.

8          THE COURT:  It's admitted.

9   BY MS. McBATH:

10  Q.  Detective Carr, are you familiar with Georgia Statute 16-6-4?

11  A.  Yes.

12  Q.  What is that statute?

13  A.  16-6-4 is child molestation.

14  Q.  Is it also aggravated child molestation --

15  A.  Yes.

16  Q.  -- in the state of Georgia?

17  A.  Yes.

18  Q.  And based on your training and experience, would engaging in

19  any type of sexual activity with a 14-year-old girl violate this

20  statute?

21         MR. SADOW:  I'm going to object that the statute is one

22  of the legal determinations.  I don't believe --

23         THE COURT:  I will sustain -- I'll sustain the

24  objection.  You may ask him his opinion about it, if you want to,

25  if it's -- if you need to further ask questions.  But as you asked

1  the question, it's a conclusion.

2  BY MS. McBATH:

3  Q.  Okay.  Detective Carr, based on your training and experience,

4  do you have an opinion as to whether or not, if someone engages in

5  any type of sexual activity with a 14-year-old girl, if that

6  activity would violate Georgia Statute 16-6-4?

7  A.  Someone over the age of 16, yes.

8          MS. McBATH:  And just to clarify the record, Judge, I

9  believe that we tendered Government's Exhibit A, but I didn't

10  specifically ask to tender Government's Exhibit Tabs 5A through 5Q.

11  We move to do that now.

12          THE COURT:  They're admitted.

13          MS. McBATH:  If I could have one moment, Your Honor.

14          THE COURT:  Yes, ma'am.

15          MS. McBATH:  Those are all the questions I have, Judge.

16          THE COURT:  All right.  I believe it will be wise to

17  wait until after lunch for cross-examination.

18          MR. SADOW:  It's up to Your Honor, whatever your

19  schedule is fine with me.

20          THE COURT:  All right.  We'll go ahead and be in recess

21  until 1:15.  You may go down.  We'll be in recess until 1:15.

22          THE CLERK:  All rise, please.  This Honorable Court's in

23  recess until 1:15.

24      [a recess was taken from 12:00 p.m. until 1:15 p.m.]

25          THE COURT:  Okay.  Cross-examination, Mr. Sadow?

1        MR. SADOW:  Yes, Your Honor.  Thank you.

2                   CROSS-EXAMINATION

3    BY MR. SADOW:

4    Q.  Good afternoon, sir.

5    A.  Good afternoon.

6    Q.  At the risk of stating the obvious, your job here as law

7    enforcement was to play an undercover role, correct?

8    A.  Yes.

9    Q.  And what I would like to do is go through the Instant Messages

10   chat and point out a few things and ask you questions as I go

11   along; okay?  If what I happen to ask you isn't clear, just tell

12   me and I'll ask it again; okay?

13   A.  Okay.

14   Q.  Was there an objective -- once you started communicating by

15   Instant Message with the defendant, did you, as a law enforcement

16   individual, have an objective in mind?

17   A.  Yes.

18   Q.  What was that objective?

19   A.  The objective is to see if a suspect was going to follow

20   through and perhaps break any laws.

21   Q.  Okay.  Follow through in what sense?

22   A.  Follow through as far as making contact, making certain

23   statements, making certain requests, things of that nature.

24   Q.  Okay.  Was one of the objectives an effort to have the

25   defendant travel to Georgia and to meet with you in your

1    undercover capacity?

2    A.  Yes.

3    Q.  And was that an objective that you recognized at the beginning

4    of the conversation with the defendant on April the 17th, 2008?

5    A.  Can you rephrase the question?

6    Q.  Yeah, I certainly will.

7           Even prior to the communication beginning with this

8    particular defendant, is it an objective of your activity as an

9    undercover agent, when playing role of minor, to attempt to get an

10   individual to travel to Paulding County, which is where you work,

11   to meet with who they would think to be the minor?

12   A.  I'll say yes and no.

13   Q.  Okay.  Tell me yes and why.

14   A.  Okay.  My objective - my objective is to allow the suspect the

15   opportunity, if that suspect chooses to come to Paulding County.

16   Q.  Okay.  So there's no attempt on your part to persuade the

17   suspect to come to Paulding County?

18   A.  Not in a direct fashion, no.

19   Q.  How about to induce or entice the suspect to come to Paulding

20   County?

21   A.  No.

22   Q.  Or to -- certainly not to coerce the suspect, correct?

23   A.  No.

24   Q.  Okay.  When you first commenced chatting with the individual

25   that turned out to be the defendant, if I understand --

1          MR. SADOW:  And I direct the Court's attention to

2  Exhibit 5.  The first two pages, I think, of Exhibit 5 have been

3  added in, correct?

4          MS. McBATH:  They are at the end of that 4/17 chat.

5  This is where -- I'll show you.  They're behind.

6          MR. SADOW:  They're behind the 4/17 chat?

7          MS. McBATH:  And the email pictures.

8          MR. SADOW:  And the email pictures.  It may be a little

9  difficult for the Court to find, but they're in 5, and they start

10  off -- I wouldn't have any problem if you want to show the Court

11  where that is.  It's in the exhibit.  It's not at the very

12  beginning.

13          THE COURT:  If you're trying to locate it, Exhibit 5A.

14          MR. SADOW:  That's the problem, Your Honor, it's not 5A.

15  It's actually Exhibit 5.

16          THE COURT:  Okay.

17          MS. McBATH:  This is the portion of the chat that was

18  left off that he found last night.

19          MR. SADOW:  And it would be in reference to these two

20  pages.

21  BY MR. SADOW:

22  Q.  I'm asking you, sir --

23  A.  Yes.  I'm trying to find them in this book.

24  Q.  Let me help you.  I put them in the front of mine.

25  A.  That's it.

 1   Q.  Okay.  We're all on the same page.  It would appear the

 2   conversation -- and I'm assuming for the purposes of my question

 3   that we're in the chatroom that you've already described and this

 4   is the initial contact between the defendant and you in your

 5   undercover capacity; okay?

 6           The defendant says, "Hi there."

 7           You say, "Hey."

 8           And then something comes up that says, "The

 9           defendant is online," correct?

10   A.  Yes.

11   Q.  And then the defendant says, "How are you?  Hope you

12           don't mind the random message."

13           You say, "No, JST," "JST" is just, "chillin'," correct?

14   A.  Yes.

15   Q.  The defendant asks, "How old are you?"

16           And you say, "A," something, "M 15," which means

17           almost 15, right?

18   A.  Yes.

19   Q.  Defendant says, "Mmmm, I'm 30."

20           You say, "That is a good age.  I hate guys my age,"

21   right?

22   A.  Yes.

23   Q.  Now, the reason why you say "I hate guys my age" is what?

24   A.  Typically girls around that time may say something like that

25   around that age.

1  Q.  Well, okay.  Is it in any way an effort on your part to

2  continue the conversation going with an individual that has

3  announced to be 30 years old?

4  A.  It's open to interpretation.

5  Q.  I mean, you didn't say "I don't like older guys," right, or "I

6  don't want to talk with older guys," correct?

7  A.  Correct.

8  Q.  Okay.  And the reason why you didn't do that is because if you

9  said, "I don't want to talk to older guys," that would defeat the

10  whole purpose of you acting in your undercover capacity?

11  A.  That is correct.

12  Q.  Okay.  And then you go on to say -- or the defendant says,

13      "Really?  I didn't want to freak you out."

14      And you say, "Long as you're nice," correct?

15  A.  Yes.

16  Q.  And then we go to the next page and the defendant says,

17      "I am nice," correct?

18  A.  Yes.

19  Q.  "Not like I'd be mean to you," correct?

20  A.  Yes.

21  Q.  "Where are you from," correct?

22  A.  Yes.

23  Q.  You say, "Sorry.  Had to," and what's that mean?

24  A.  "P."

25  Q.  "P" as in?

1  A.  Use the facilities.

2  Q.  Okay.  "From Georgia," because there's a delay there of a few

3  seconds, right?

4  A.  Right.

5  Q.  Okay.  The defendant says, "Kentucky here."

6      You say, "P."  What's that?

7  A.  I don't know.

8  Q.  And then the defendant says, "Can I see a pic?"

9      You say, "On my profile," right?

10 A.  Yes.

11 Q.  And then the chat begins?

12 A.  Yes.  Now, if I can go back to your original statement, sir,

13 this is actually not in the chatroom.  This is an Instant Message.

14 This is not a chatroom.

15 Q.  Okay.  This is an Instant Message and then --

16 A.  Right.

17 Q.  -- you go from an Instant Message into -- I'm sorry.  Is the

18 April 17th all Instant Messaging?

19 A.  Yes.  The chatroom is not on here because there was no

20 dialogue in the chatroom.  May I?

21 Q.  Certainly, by all means.  I want to make sure that I

22 understand so the Court can understand.

23 A.  Right.

24 Q.  Or maybe the Court already understands and I need to

25 understand.

1  A.  This is an example of a chatroom.

2  Q.  Okay.

3  A.  At one point --

4  Q.  Which exhibit are you talking about?

5  A.  This would be -- I don't have an exhibit number on here.

6         MS. McBATH:  That one is Exhibit 2.

7  BY MR. SADOW:

8  Q.  Exhibit 2.

9  A.  All right.  Exhibit 2, which is a sample of a chatroom -- in

10  this sample, this is where myself and the defendant would be

11  listed and the defendant would then click on here to me and he

12  could send me -- anyone could send anyone an Instant Message which

13  then this pops up.

14  Q.  Okay.  Gotcha.

15  A.  Which is where we're at now.

16  Q.  We're out of the chatroom?

17  A.  That is correct.

18  Q.  And you're just talking, that is, by computer with each other?

19  A.  Yes.

20  Q.  Right?

21  A.  Yes.

22  Q.  So no one else is having access to this conversation?

23  A.  Yes.

24  Q.  Except the two of you, correct?

25  A.  Correct.

1   Q.  All right.  And now we go, if we can -- staying, though, on

2   Exhibit 5.  After the defendant says "Can I see a pic?" and you

3   say "On my profile," do we pick up immediately again, which is now

4   the very first page of 5A?

5   A.  Yes.

6   Q.  Yes?

7   A.  Yes.

8   Q.  Where you say, "Young guys are immature and stupid"?

9   A.  You said 5A.

10  Q.  I'm sorry.  I meant 5.  Do we pick up at 5?

11  A.  Yes.

12  Q.  Where you say, "Young guys are immature and stupid"?

13  A.  Yes.

14  Q.  And the purpose for you saying that "young guys are immature

15  and stupid" would be?

16  A.  As posing as a 14-year-old girl, young guys are immature and

17  stupid.

18  Q.  Okay.  And at this point the defendant says essentially "are

19  you a virgin," right?

20  A.  Yes.

21  Q.  And then you begin a communication which we can pick up on 5A,

22  right?

23  A.  5A?

24  Q.  5A.

25  A.  Yes.

1   Q.  If you can go to the 4:10:36 seconds, 4:10 p.m., 36 seconds.

2   A.  Yes.

3   Q.  That's where you were saying, "Young guys are immature and

4   stupid"?

5   A.  Yes.

6   Q.  And this begins a conversation in which you and the defendant

7   are talking about "young girls" and "sexy" and so forth, correct?

8   A.  Yes.

9   Q.  And at one point, as I said before, the defendant at 4:14:22

10  p.m. says, "Are you a virgin?"

11  A.  Yes.

12  Q.  And you say, "Yes.  Please don't hold it against me."

13      Then he says, "I don't at all."

14      He says, "Many 15 year olds are virgins."

15      And you say, "I came close once."

16      And when you're saying "I came close once," you

17      meant what?

18  A.  That there had been a situation in my life where I may have

19  came close to not being a virgin anymore.

20  Q.  Okay.  And you're talking -- or making reference --

21  A.  To Carilee.

22  Q.  To what would be a sexual encounter, correct?

23  A.  Correct.

24  Q.  And you go on to say, "My boyfriend," BF, "got scared

25      and ran away," correct?

1    A.  Yes.

2    Q.  And then there is an ensuing conversation in which you're

3    talking about things that Cari, you undercover, may have done in

4    the past with others, correct?

5    A.  Yeah.  Where are you referring to, sir?

6    Q.  You continue on.  He says, "So you've pretty much done

7        everything else with a guy?"

8    A.  Okay.

9    Q.  You say, "I don't think so."

10       He says, "I assume you've kissed, right?"

11       You say, "Yes."

12       He says, "Felt a guy's cock?"

13       You say, "Yes," correct?

14   A.  Yes.

15   Q.  All right.

16   A.  I just wanted to make sure we're in the same place.

17   Q.  We're on the same place, right?

18   A.  Yes.

19   Q.  Now, during this conversation -- and I'm talking about this

20   page and you keep going -- does there appear to be any

21   unwillingness for you to talk about these things?

22   A.  Yes.

23   Q.  Where you say, "Slow down, make me blush"?

24   A.  Yes.

25   Q.  Is that the unwillingness?

1   A.  Yes.

2   Q.  Is there anything else in the first conversation in which you

3   indicate anything at all about being unwilling to talk about these

4   matters?

5   A.  Well, after I said, "What's your name" -- or after I said,

6   "Slow down, make me blush," I tried to change the conversation

7   more to a general dialogue, such as "What is your name?" and tried

8   to get some more general information.

9   Q.  All right.  And then starting at 4:31:07 you say,

10          "Wish you were closer," right?

11  A.  Yes.

12  Q.  The defendant says, "Where are you?"

13          You say, "Dallas, Georgia."

14          And then you say, "You?"

15          "Louisville, Kentucky."

16          And you say, "You seem nice.  Ever get to Georgia?"

17          right?

18  A.  Yes.

19  Q.  What you're saying is "Do you ever get to Georgia?" and you're

20  suggesting or leaving open a possibility "If you get to Georgia,

21  you might be able to see me," isn't that the reason you brought

22  that up?

23  A.  "Ever get to Georgia" -- not necessarily, no, sir.

24  Q.  So the reason for you saying, "You seem nice.  Ever get to

25  Georgia?" would be what?

1    A.  Did you ever get to Georgia?  Maybe he knows Georgia, I don't

2    know.

3    Q.  Okay.

4    A.  Also at this point in the investigation I was not sure where

5    the person's from.  He could tell me he's from California, I

6    wouldn't know the difference.

7    Q.  Okay.  So the fact that he told you he was from Louisville at

8    that point, without checking it out further, you really don't

9    know?

10   A.  Correct.

11   Q.  Okay.  The defendant goes on to say he'll be in Atlanta for a

12   week in June.  Then the next page at 4:36:38 the defendant says,

13        "It wouldn't freak you out to meet a guy my age?"

14        And you say, "No.  I like guys who can talk

15        intelligent," correct?

16   A.  Yes.

17   Q.  So would you say this is just basically a get-to-know-you kind

18   of conversation?

19   A.  Well, this is the first conversation.  I mean, that's part of

20   the process where, when people chat online, they get to know each

21   other and -- at least, you know, what you can possibly believe

22   when the people are talking.

23   Q.  Okay.  And were there photos that were -- at this point were

24   sent by email?

25   A.  I believe they were already sent, yes.

1  Q.  One fully clothed and one with a shirt and a portion of pubic

2  hair revealed?

3  A.  Yes.

4  Q.  And then we go to the next date, right -- or the next Instant

5  Messaging, correct?

6  A.  If that's where you're going, yes.

7  Q.  Well, see, earlier on in your direct testimony you said that

8  you, as an undercover agent -- it wasn't until at the end of May--

9  actually, it wasn't until May that you had actually attempted to

10 contact the defendant as opposed to the defendant contacting you,

11 correct?

12 A.  Yes.

13 Q.  But that's not accurate, is it?

14 A.  To my knowledge, it is.

15 Q.  Well, let's go to the very first page of 5B.

16 A.  Okay.

17 Q.  At 1:59 -- and this is on 4/21/08, correct?

18 A.  Okay.

19 Q.  Didn't you say at 1:59 p.m., "I sent you a message

20        Friday"?

21 A.  Yes.

22 Q.  And the defendant says, "Oh, I didn't get it."

23        And you say, "Was just saying hi."

24 A.  Right.

25 Q.  So you did in fact attempt to contact the defendant earlier

1   than May?  In fact, you attempted to contact the defendant after

2   the first IM date, correct?

3   A.  I put this on there.  I don't know if I did or not.  I

4   honestly don't -- I don't have a record of it, which I would have

5   a record of.  Again, when we're talking chat, it easily could have

6   been, hey, I was just trying -- thought I'd say hi, make the

7   person feel good, because he obviously didn't get it.

8   Q.  All right.  So I think what you just said is you may have just

9   been making this up --

10  A.  Correct.

11  Q.  -- this may not have been true?

12  A.  That is correct, sir, because I have documentation of all my

13  communication.

14  Q.  Okay.  So what you happen to say in here obviously doesn't

15  make it necessarily true, right?  The fact that you make comments

16  in here doesn't make it true?  We know that, because you were

17  playing an undercover role.

18  A.  Yes.

19  Q.  Okay.  So this is part of your undercover role?

20  A.  Yes.

21  Q.  Okay.  I want you to go to the chat, the 4/21 Instant Message.

22  I say "chat."  The 4/21 Instant Message at 2:25 p.m.  Do you see

23  where the defendant says, "What kind of pics do you want?"

24      And you say, "You decide"?

25  A.  Yes.

1   Q.  The defendant says, "Well, I don't want to offend

2          you," correct?

3   A.  Yes.

4   Q.  You say, "I may be 14, but not easily offended."

5          And he says, "You are 14?  I thought you were 16."

6   A.  Yes.

7   Q.  Just four days before that, you had told the defendant that

8   you were almost 15, correct?

9   A.  Yes.

10  Q.  And four days later the defendant says, "I thought  you were

11  16," right?

12  A.  Yes.

13  Q.  Did you get the impression that the defendant didn't remember

14  or that -- you don't know?

15  A.  I don't know.

16  Q.  Okay.  Then at the bottom of the page, 2:30, it says,

17         "Is it weird that I like it that you are 14?"

18         And then you say, "I'll be 15 soon," correct?

19  A.  Yes.

20  Q.  Again the defendant says, "You know I'm 30, right?"

21         And you say, "Yeah.  I like older guys, if they are

22         not idiots and you seem nice," correct?

23  A.  Yes.

24  Q.  And then the remainder -- if you'll remember in that

25  particular Instant Messaging, there's discussions about the

1   defendant wanting more pictures, correct?

2   A.  Yes.

3   Q.  He had sent you pictures, too, and during this Instant Message

4   he sends you two more, does he not?

5   A.  I believe so, yes.

6   Q.  And he's always kind of asking for pictures in return,

7   correct?

8   A.  Yes.

9   Q.  It's clear that he wanted the pictures?

10  A.  Yes.

11  Q.  Okay.  At 3:14 p.m. the same day, April 21, you Instant

12  Message -- I'm sorry.  At 3:13 you Instant Message,

13        "I have to trust you first because I don't want to

14        be all over the internet," talking about pictures,

15        right, sending pictures?

16  A.  Yes.

17  Q.  He says, "OMG," oh my God, "No, I would never do

18        that," correct?

19  A.  Yes.

20  Q.  And you say, "I didn't think so.  But we just met so

21        I'm a little scared," right?

22  A.  Yes.

23  Q.  And he says, "I know.  We can take our time," right?

24  A.  Yes.

25  Q.  "I don't want to rush or pressure you," correct?

1  A.  Yes.

2  Q.  Let's go to -- if you would, let's go to 3:31 p.m., same

3  Instant Message, April 21st, where he says --

4       "Guys around here are all jerks especially ones my

5       age.  Just talking with you is more fun than any

6       date I've been on," that's what you say, correct?

7  A.  Yes.

8  Q.  And he asks, "Are you a virgin?"

9       And you say, "Unfortunately."

10      And then you say, "Embarrassed," right?

11 A.  Yes.

12 Q.  Why do you say "unfortunately" there?

13 A.  I don't know.

14 Q.  Well, isn't "unfortunately" suggestive of the fact that you

15 don't want to be a virgin?

16 A.  It could be construed that way.

17 Q.  And "embarrassed" at the fact that you would have to tell

18 someone that you're a virgin?

19 A.  Well, the fact that I'm 14 talking with an adult male.

20 Q.  I'm sorry.  Are you trying to tell us that when you used the

21 word "embarrassed" in that context, that what you were referring

22 to is being embarrassed talking to an adult male and not being

23 embarrassed because you were a virgin?  You're not really saying

24 that, are you?  That "embarrassed" goes to being a virgin, doesn't

25 it?

1  A.  Well, that's what I meant, yes.

2  Q.  When that comes up about the virgin, that's the second time

3  that the defendant has asked you about being a virgin, right?

4  A.  I believe --

5  Q.  He asked you about it the first time in the first Instant

6  Messaging on April the 17th?

7  A.  Yes, I believe so.

8  Q.  And now he asks again April 21st, correct?

9  A.  Yes.

10  Q.  Did you get the feeling that the defendant had just forgotten

11  what your answer was or maybe that he was talking to more people?

12  What did you think?

13  A.  Well, that -- personally that would be speculative on my part.

14  I really didn't know.  It could have went either way.  It could

15  have been both.

16  Q.  And then you go on in that conversation in which -- at 3:38

17  p.m. -- this is still April 21st -- he says, the defendant,

18          "How far have you gone with a guy?"

19      And then there's a question mark, which I assume means you

20  haven't answered yet, correct?

21  A.  Yes.

22  Q.  And then you say, "My last BF," which I assume means

23  boyfriend?

24  A.  Yes.

25  Q.  "We were almost all the way and he came before he

1          could put it in," correct?

2    A.  Yes.

3    Q.  Your use of the terminology "came" -- without being

4    unnecessarily graphic, we're talking about ejaculation, correct?

5    A.  Yes.

6    Q.  So you bring that up, right?

7    A.  Yes.

8    Q.  Not the defendant.  You bring it up?

9    A.  Yes.

10   Q.  And then you say, "Then he got up and ran away," right?

11   A.  Yes.

12   Q.  And then there's a conversation, now that you've brought up

13   coming, about where that occurred, right, physically?

14   A.  Yes.

15   Q.  And then we get to 3:47 p.m., and you say, "Yes.  I'm

16          glad though, because I would rather be with someone

17          who knows what's going on," right?

18   A.  I'm looking for the place that you're at, sir.

19   Q.  3:47 p.m., April 21st.

20   A.  Yes, I have it.  Okay.  Yes.

21   Q.  Is that your way -- your undercover-acting-as-a-minor way of

22   saying that you would rather be with an older man like the

23   defendant than someone younger?

24   A.  Again, that's open to interpretation.  It doesn't have to be

25   an older man.

1  Q.  Rather than being open to interpretation because that doesn't

2  really help us --

3  A.  I understand.

4  Q.  No, it's my fault.  It's not your fault.

5         Tell me what you meant when you said it, that way we

6  don't get into the interpretation.  When you said it, what did you

7  mean?

8  A.  Someone with more experience sexually.

9  Q.  And then for the remainder of that conversation there is

10  discussion about the size -- the defendant is commenting on the

11  size of his penis and we're talking about bra size, other sexually

12  explicit things, correct?

13  A.  Yes.

14  Q.  Now, there's still no -- we've had a partial nude photo where

15  there's been some pubic hair that's been emailed from the

16  defendant to you in your undercover capacity, but not the totally

17  nude photo yet, correct?

18  A.  Correct.

19  Q.  Okay.  And in 5C, which is the April 23rd, 2008 IM, it's

20  labeled "IM Chat," but it really isn't an IM chat, is it?  It's

21  not a chatroom, it's just an IM?

22  A.  Yeah.  It's chatting with an Instant Message.  It can be

23  labeled either way.

24  Q.  Right.

25  A.  I'm with you.

1   Q.  Okay.  We're still Instant Messaging and now the defendant is

2   again asking for more pictures, correct, throughout that

3   conversation?

4   A.  Yes, yes.

5   Q.  I mean, so far from the first three IMs, what we've got is the

6   defendant certainly wants pictures, correct?

7   A.  Yes.

8   Q.  And he certainly likes to talk about explicit things, correct?

9   A.  Yes.

10  Q.  Now we go to April 25th, 2008, another IM.  This is a

11  conversation -- and I'm looking at 2:32:46 p.m. in which she says

12  she may be -- you say that you may be traveling up to Ohio, to

13  Cleveland, and the defendant makes some comment about "maybe I'll

14  do some job traveling to Cleveland this summer," right?

15  A.  Yes.

16  Q.  Leaving, of course, the impression that maybe he'd be able to

17  see you if you were in Ohio?

18  A.  Yes.

19  Q.  And you then say, "That would be cool.  Are you still

20      coming to Atlanta?" right?

21  A.  Yes.

22  Q.  And the purpose for bringing that up again is, whether the

23  defendant's coming to Atlanta?

24  A.  Yeah.  Since he started talking about Cleveland "Are you still

25  coming to Atlanta or are we now going to Cleveland?"

1  Q. Going to the next page.  The defendant at 2:41 says,

2       "Have you ever met a guy from online before?"

3       You say, "No.  But you seem nice and I know what

4       you look like and stuff," correct?

5  A. Yes.

6  Q. And the defendant says, "And I think the same of you,"

7  correct?

8  A. Yes.

9  Q. And the defendant says first, "I'd be nervous," right?

10 A. Yes.

11 Q. And you say, "I'm nervous now because you are so

12      mature and sexy," right?

13 A. Yes.

14 Q. Now, why use the terms "mature" and "sexy"?  I mean, you're

15 not trying to entice the defendant into continuing this, are you?

16 A. No.

17 Q. So you wouldn't consider saying "I'm nervous now because you

18 are mature," or "so mature and sexy" -- you wouldn't consider that

19 some form of enticement or inducement by you as the minor, would

20 you?

21 A. No.  I'd consider it more of a compliment.

22 Q. Just a compliment, not an enticement or inducement?

23 A. Yes.

24 Q. Okay.  And then for the next couple of pages we've got more

25 conversation about pictures, correct?

1   A.  Yes.

2   Q.  The defendant again asked for sexy pictures of you, in your

3   undercover capacity?

4   A.  Yes.

5   Q.  And then there's some conversation and the defendant at that

6   point sends you, I assume, the nude photo, the totally nude photo,

7   frontal nude?

8   A.  I believe that was, without looking at the dates of it, yes.

9   Q.  Because if you go to Page -- or you go to the 3:25:21 p.m. --

10  A.  Yes, sir, this is the time.  If you go down to -- 3:29

11  confirms that.

12  Q.  Right.  But the conversation that leads up to it is 3:25:21

13  p.m., "Did you getting my pics?" correct?

14  A.  Yes.

15  Q.  And you say, "Wow, didn't see that comin'.  Don't

16      know what to say."

17      And the defendant says, "I thought that's what you

18      wanted," and says, "I'm sorry if I offended,"

19      correct?

20  A.  Yes.

21  Q.  You say, "No offense taken.  Was surprised."

22      And he says, "Do you like?"

23      You say, "Yea, very sexy."

24      And then there's conversation again about his penis, correct?

25  A.  Yes.

1   Q.  But then again on 3:31:38 p.m. he says, "You are a

2         virgin, right?"

3       So we have another conversation about -- or reference to you

4   being a virgin?

5   A.  Yes.

6   Q.  And again he says, "How far have you gone with a guy?" right?

7   A.  Yes.

8   Q.  In the conversation IM on 4/21 he'd already asked you -- the

9   defendant already asked you how far you'd gone with a guy, right?

10  A.  Yes.

11  Q.  So now he's asking the same thing again.  Now, did you

12  understand that because he didn't remember who you were, what did

13  you interpret?

14  A.  I interpreted it as he may have had a very bad memory.  I

15  really didn't know.

16  Q.  Or that maybe he just liked to talk about it?

17  A.  I don't know.

18  Q.  You don't know?

19  A.  I don't know.

20  Q.  Okay.  In fact, you comment on it because the defendant goes

21  on to say, "Told you last" --

22        You go on to say at 3:39:09, "Told you my last F" --

23        I'm not sure, "finished before we could and ran

24        away," right?

25  A.  Yes.

1   Q.  And he says, the defendant says, "I know that.  But

2       have you sucked cock?" right?

3   A.  Yes.

4   Q.  And you say, "No, never did that.  Don't really know

5       how really."

6       And you go on to say, "You forgot everything we

7       talked about," right?

8   A.  Yes.

9   Q.  And then a little later in that same thing you say at 3:38:25

10  p.m., "It's okay.  Just feels funny talking about it."

11      And you asked the defendant, "Could you teach me?"

12      right?

13  A.  Yes.

14  Q.  All right.  So when you asked the defendant "could you teach

15  me," you're asking the defendant whether or not he would be

16  willing to, what, show you how to, terminology, "suck cock"?

17  A.  Yeah.  And that follows up with something else, but yes.

18  Q.  It doesn't sound, at least at this point -- and this is the

19  conversation of 4/25.  It doesn't sound like you're unwilling to

20  engage in sexual activity, does it?

21  A.  Referring to what?

22  Q.  Well, I mean, you just said "could you teach me" essentially

23  how to --

24  A.  Well, prior to that, the subject -- or the defendant asked me

25  do I want to learn how.

1   Q.   And you say, "Can you teach me?" right?

2   A.   Yes.

3   Q.   Okay.  I mean, there's no resistance here, you'd agree with

4   that, on your part?

5   A.   On this -- yes, on this statement.

6   Q.   And you agree there's no reluctance at this point, correct?

7   A.   On this statement, no.

8   Q.   Okay.  And then if we could -- let's go to 3:52.  Actually,

9   3:51:15.  The defendant says, "Do you think you'd have

10          fun if I taught you for real?"

11          You say, "I think so."

12          The defendant says, "If we were doing anything you

13          didn't want, you wanted me to stop, I totally

14          would," correct?

15  A.   Yes.

16  Q.   "I'd never pressure or force you," correct?

17  A.   Yes.

18  Q.   As we move into the month of May, are there any other IMs that

19  take place in which you show a reluctance or a resistance or an

20  unwillingness to engage in sexual activity?

21  A.   Sir, can you be more specific?  You said in the month of May?

22  Q.   No, no.  We just went through April 25th.  We're about to get

23  into May.

24  A.   Okay.

25  Q.   Is there any time between -- the end of April and the

1   beginning of May in which there's a reluctance, an unwillingness,

2   or resistance on your part to engaging in sexual activity?

3   A.  Are you referring in general to --

4   Q.  Yeah.

5   A.  Yes, there was back when we talked about I had to slow him

6   down because I was blushing.

7   Q.  I'm talking about since then.  I'm talking about any more

8   reluctance.

9   A.  No, not that I'm aware, without going through the chats again.

10  Q.  So going into May, which is 5F -- essentially for the entire

11  month of May there is no real Instant Messaging that's taking

12  place in which there's any conversation until the end of the month

13  regarding sexual activity, correct?

14  A.  Yes.

15  Q.  And going into what is 5F, Friday, May 30th, 2008, at 4:19:40,

16  when you start talking again, you say, "I look at your

17         pics every day," correct?

18  A.  Yes.

19  Q.  You bring up at 4:27:58 p.m., "Didn't you say you were

20         coming to Atlanta before?"  correct?

21  A.  Yes.

22  Q.  The defendant doesn't bring that up, you bring that up,

23  correct?

24  A.  Yes.

25  Q.  At 4:28:26 the defendant says, "I'll be there June 16th

1          to 20th."

2          You asked whether there was any free time, correct?

3   A.  Yes.

4   Q.  At 4:30 you say, "Cool.  We will make plans," and then

5          "wink," right?

6   A.  Yes.

7   Q.  What does "wink" mean?

8   A.  "Wink" means a wink.

9   Q.  Well, I mean, is it a "wink" just as "hey, I'm winking at

10  you," or a wink "hey, you know I've got something else in mind"?

11  What does "wink" mean?

12  A.  Just "wink."  I mean, it could be interpreted either way.

13  Q.  What did you mean when you used it?

14  A.  We can make plans, wink.

15  Q.  Okay.  And, again, now the defendant -- this is -- now we're

16  at the end of May, "Remind me, baby, are you a virgin?" right?

17  4:30:31.

18  A.  Yes.

19  Q.  So we've gone through three -- this is the fourth time the

20  defendant has asked in some form or fashion whether you're a

21  virgin, correct?

22  A.  Something like that, yes.

23  Q.  At this point do you think that maybe he just isn't paying

24  attention or what do you think when he keeps asking you whether

25  you're a virgin?

1  A.  Sir, I really didn't - I really didn't know.  I didn't know

2  what to think, whether it was poor memory or something else.

3  Q.  Maybe he was just talking to other people and he didn't

4  remember who you were?

5  A.  Perhaps.

6  Q.  Okay.  And then at 4:37:26 p.m. on that date, which is, again,

7  May 30th, he asked you, "What pics did I send you of me?"

8       correct?

9  A.  Yes.

10 Q.  So at least as to this conversation, he doesn't even remember

11 what pics he sent you, right?

12 A.  Correct.

13 Q.  And you asked -- he asked you whether you liked, baby.

14      And you say, "Every day.  Email me more."

15     You're looking for him to email more pics, right?

16 A.  Yes.

17 Q.  And then he says, no, you -- basically "I'll take some more

18 when you send pictures of you," correct?

19 A.  Yes.

20 Q.  June 10, 2008, Exhibit 5J.  At 3:39:15 p.m. the defendant

21      says, "You know next week I'm going to be in

22      Atlanta," right?

23 A.  Yes.

24 Q.  You say, "Oh, yea.  Tuesday" -- "Tuesday night I plan

25      on staying the night at my friend's house, wink,"

1       right?

2   A.  Yes.

3   Q.  And when you used "wink" again, what did you mean there?

4   A.  That obviously that's the plan of the plans that were --

5   that's the plan of how I'm getting out of the house, wink.

6   Q.  It does not appear that you were showing any reluctance or

7   resistance or unwillingness at this point, would you agree?

8   A.  No.  I mean yes.

9   Q.  Yes, you'd agree?

10  A.  Yes.

11  Q.  Okay.

12  A.  Sorry.

13  Q.  Continuing on in the same 6/10 Instant Messaging, we go to

14  3:56:59.  The defendant says, "Aha..I'm a dork, I know."

15      Then he says, "Cari...when we get back to the

16      hotel...we don't 'have' to do anything, you know.

17      We can just talk..and kiss or whatever."

18      And you say, "You're so nice.  I'm not afraid to

19      try the things that we've talked about," right?

20  A.  Yes.

21  Q.  Certainly no unwillingness, resistance, or reluctance there,

22  correct?

23  A.  Yes.

24  Q.  And then the defendant says, "Okay..I just don't want

25      to pressure you," right?

1   A.   Yes.

2   Q.   Then we go -- skip to 5P, which is June the 16th.  And we're

3   talking email here, correct?

4   A.   Yes.

5   Q.   And just again so that it's clear, the Instant Messaging is in

6   fact instant; that is, the messages are traded back and forth in

7   almost realtime, correct?

8   A.   Yes.

9   Q.   Obviously in email there can be some delay?

10  A.   Correct.

11  Q.   This email is from the defendant June 16th, 6:57 p.m.,

12  correct?  The one I'm talking about --

13  A.   Yes, I see which one you're referring to.

14  Q.   In that the defendant says, "How about I come in Subway,

15       we meet, have a soda and just talk for a bit.  That

16       sound good?  Then we can take it from there.

17       Hopefully if traffic is good, we'll have plenty of

18       time that night to do whatever we want," correct?

19  A.   Yes.

20  Q.   You'd agree with me it doesn't sound like the defendant is

21  attempting to pressure you to do anything, correct?

22  A.   Yes.

23  Q.   And then the next email is at 11:36 p.m., that same date, June

24  16th, correct?  It should be the next page.

25  A.   I have 11:13 on the next page.  The following page after that?

1  Q.  It should be -- the email we just went over was at 6:57 on

2  June 16th.

3  A.  Right.

4  Q.  Now I'm looking at June 16th at 11:36 p.m.

5  A.  Okay.  I have that one.

6  Q.  Got it?

7  A.  Yes.

8  Q.  In which the defendant -- and this is actually the day before

9  the defendant is supposed to meet with you as Carilee, right?

10  A.  Carilee, yes.

11  Q.  Carilee.  And at 11:36 at night the defendant sends an email

12  that says, "One more thing...you are 16, right?"

13  A.  Yes.

14  Q.  Now, in your opinion, based on your experience, if the minor

15  is 16, it is not child molestation in Georgia, is it?

16  A.  No, it is not.

17  Q.  So the day before the defendant is supposed to meet with you,

18  he wants to know "You are 16, right"?

19  A.  Yes.

20  Q.  Now we're almost -- it's been about two months, give or take a

21  few days, in which you have told the defendant, as you said on

22  4/17 and 4/21, that you're, one time, almost 15, which means

23  you're 14, and then one time specifically that you're 14, right?

24  A.  Yes.

25  Q.  So when the defendant sends you an email the day before you're

1   supposed to meet -- in fact, late that night before, and says,

2   "You're 16?" what did you take it as?

3   A.  I didn't know how to take it.  I didn't expect to even see it

4   coming, because I didn't see it until the following morning.

5   Q.  Which takes us to Tab Exhibit 5Q, right?

6   A.  Yes.

7   Q.  And you respond to that at 10:50 in the morning, right?

8   A.  Yes.

9   Q.  You say, "My sweet sixteen is coming up.  We can

10         celebrate early," right?

11  A.  Yes.

12  Q.  Now, I'll need your assistance on this; okay?  Is the email

13  that follows that, the June 17th, 11:06 a.m. email --

14  A.  Yes.

15  Q.  -- is that in reply to the 10:50:36 a.m. email?

16  A.  There's no way to tell that or not.

17  Q.  Well, if there's no way to tell if it is or not, then there's

18  no way to tell whether the defendant received your response in

19  which you say "My Sweet 16 is coming up," right?

20  A.  The only thing I could say on that is that he had to have

21  logged into his email to send an email from that account, which

22  means that it would have been there to see.

23  Q.  Would have been.  As far as you could tell, it would be there.

24  Whether he actually saw it or not, you don't know?

25  A.  I don't know.

1    Q.  So your response, "My Sweet 16 is coming up," as far as the

2    evidence in this case is, we don't know or not whether he saw it,

3    correct?

4    A.  Yes, we don't.

5    Q.  Okay.  And there's no more discussion about age, right?

6    A.  Correct.

7    Q.  Now, help me out just a little bit here.  Can you point to any

8    time in May or June of '08 in which you, as the undercover

9    individual, the minor, showed any form -- fashion of reluctance,

10   resistance, or unwillingness to engage in sexual activity?

11   A.  Well, in the very beginning --

12   Q.  I'm talking May and June, May and June.

13   A.  No.

14   Q.  Okay.  So now we're moving into April.  Other than that one

15   time you say "You're moving too fast, I'm blushing," did you show

16   any resistance, reluctance, or unwillingness to talk about sexual

17   activity in an Instant Message?

18   A.  Other than a few comments of embarrassment, no.

19   Q.  Okay.  Which went to the idea of being a virgin, correct?

20   A.  Yes, I believe so.

21   Q.  Now, when you searched the defendant's computer -- which I

22   understand was found in the hotel room, right?

23   A.  Yes.

24   Q.  Did you find any child pornography?

25   A.  No.

1          MR. SADOW:  I'm going to want to play the CD of the

2  post-arrest statement in about one minute.

3  BY MR. SADOW:

4  Q.  If I understand correctly, when the defendant was arrested,

5  you gave him his *Miranda* rights, correct?

6  A.  Yes.

7  Q.  Did you in any way attempt to persuade, induce, entice, or

8  coerce him into agreeing to an interview?

9  A.  No.

10  Q.  You basically just asked, right?

11  A.  Yes.

12  Q.  You told him what his rights were and you just asked him

13  whether or not he'd agree to an interview and he did?

14  A.  Yes.

15          MR. SADOW:  I'm ready to play that, Your Honor.  I'd

16  like the Court to see the actual post-arrest statement.

17          THE COURT:  All right.

18          THE WITNESS:  Excuse me a minute.  May I step down and

19  get a glass of water --

20          THE COURT:  Yes, sir.

21          THE WITNESS:  -- Your Honor?

22          THE COURT:  Yes, sir.

23          THE WITNESS:  Thank you.

24          MR. SADOW:  So the Court's aware, when I first got this

25  CD or DVD, whichever one this is, I couldn't play it either.  So I

1  asked the Government to give me a VHS tape, which they did, and I

2  was able to observe it.  I was concerned that we might have the

3  same problem.  These folks -- it will play on their system, but

4  apparently play on no others.  So is it okay if I use the VHS to

5  play it?

6           MS. McBATH:  That's no problem.

7           MR. SADOW:  All right.

8           MS. McBATH:  It's the tape we gave you, right?

9                [off-the-record discussion]

10          MR. SADOW:  Your Honor, I'm now going to play the VHS

11 copy of Government's Exhibit 16.

12          THE COURT:  All right, sir.

13                [Exhibit 16A was played and paused]

14 BY MR. SADOW:

15 Q.  When you just had that statement -- made that statement to the

16 defendant about "there's a lot worse things, it's not the end of

17 the world," that wasn't an attempt by you to persuade or entice

18 him into continuing to converse with you?

19 A.  No.  It's part of -- more of a rationalization-type technique.

20 Q.  Okay.

21                [Exhibit 16A was played and paused]

22 BY MR. SADOW:

23 Q.  Is there anything else that takes place -- any more

24 interaction between you and the defendant?

25 A.  No.  At this point he's been placed in custody.

1   Q.  All right.  You may have testified to this already, and if you

2   did, I apologize, but when the defendant was actually being

3   arrested you asked him a question, did you not, about if he knew

4   why he was being arrested?

5   A.  Yes.

6   Q.  Okay.  Did you testify to this earlier?

7   A.  I'm not sure.

8   Q.  And the defendant stated yes, because he was going to meet

9   someone, correct?

10  A.  Yes.

11  Q.  At the time that this investigation was ongoing it was a

12  purely -- I want to say local, but it was purely one arising out

13  of Paulding County law enforcement, correct?

14  A.  Yes.

15  Q.  There was no federal involvement?

16  A.  No.

17  Q.  You had not had contact with any federal law enforcement or

18  prosecutor at all, correct?

19  A.  Correct.

20  Q.  It was only after the arrest took place and sometime later,

21  after defendant was actually released on bond in Paulding County,

22  that federal authorities got involved, correct?

23  A.  Correct.

24          MR. SADOW:  Your Honor, if I might, just for the record,

25  why don't we mark the VHS tape 16A.  To the extent the Court ever

1  wants to see it again, at least you'll be able to see the VHS tape.

2              THE COURT:  All right, that's fine.

3              MS. McBATH:  No objection.

4              MR. SADOW:  Your Honor, that's all I have for

5  cross-examination.

6              THE COURT:  All right.  Redirect, Ms. McBath?

7              MS. McBATH:  Yes, Your Honor, just briefly.

8                      REDIRECT EXAMINATION

9  BY MS. McBATH:

10 Q.  Detective Carr, you said that the defendant encountered Cari

11 in a teen chatroom, right?

12 A.  Yes.

13 Q.  And the defendant was the person to reach out and contact Cari

14 first, right?

15 A.  Yes.

16 Q.  I'd like to direct your attention to Tab 5E, which is the

17 April 29th chat, and I'd like to direct your attention to 2:23

18 p.m.  Does Cari say at that point that she is, quote, a "little

19 nervous"?

20 A.  I'm sorry.  That was 5E at what time?

21 Q.  2:23 p.m.

22 A.  Yes.

23 Q.  Can you read what Cari says at 2:23 p.m.

24 A.  Cari stated at 2:23 p.m., "I never been this way with

25      someone your age or online stuff, little nervous."

 1  Q.  Now if you could please flip to Tab 5F, which is the May --

 2  I'd like to draw your attention to the May 30th chat.  At 4:34

 3  p.m. does Cari say that she is "just a little scared"?

 4  A.  Yes.  At 4:34 Cari states, "I have to say I'm just a

 5       little scared because we only talk online, but also

 6       excited."

 7  Q.  Tab 5D.

 8            THE COURT:  Did you say "D"?

 9            MS. McBATH:  "D" as in dog.

10  BY MS. McBATH:

11  Q.  Which is the April 25th chat.  At 2:58:22 does the defendant

12  ask that Cari take a picture of her just in her bra and panties?

13  A.  Yes.  At 2:58:22 the defendant states, excuse me,

14       "Oh, they are sexy..but I mean..would you take a

15       pic of you in just bra and panties?"

16  Q.  Does Cari agree to do so?

17  A.  No.

18  Q.  Does the defendant drop it at that point?

19  A.  Yes.

20  Q.  Does he encourage -- does he go on to encourage Cari to take

21  pictures of her in her bra and panties?

22  A.  Yes.

23  Q.  Even after Cari says that she doesn't want to?

24  A.  Yes.

25  Q.  Going now to Tab 5B, as in boy.

1   A.  I'm going backwards.

2   Q.  Which is the April 21st chat.  At 2:28 p.m. what does the

3   defendant say?

4   A.  At 2:28 the defendant states, "You are 14?  I thought

5         you were 16..LOL," laugh out loud.

6   Q.  And what was your understanding of what the defendant meant by

7   saying laugh out loud?

8   A.  As in kind of just kidding type, ha ha.

9   Q.  At 3:39 in the same chat -- at 3:39 p.m. the defendant asks

10  you specifically -- defense attorney asked you specifically about

11  this where Cari said -- Cari was describing an experience that she

12  had with her boyfriend and they had almost, quote-unquote, gone

13  all the way, and the defense attorney said you brought this up,

14  didn't he ask you that?

15  A.  Yes.

16  Q.  But Cari was actually responding to a question that defendant

17  asked.  Isn't that right?

18  A.  Yes.

19  Q.  She was responding to the question "How far have you

20        gone with a guy?" was she not?

21  A.  Yes.

22  Q.  Did Cari bring up sexual experience first or did defendant?

23  A.  Defendant.

24  Q.  Did Cari say that she was a virgin first or did the defendant

25  ask Cari if she was a virgin first?

1  A.  The defendant asked Cari if she was a virgin.

2  Q.  Who asked whom to send, quote-unquote, sexy pictures?

3  A.  Defendant asked Cari.

4  Q.  Did Cari ever ask the defendant to send, quote-unquote, sexy

5  pictures?

6  A.  Not directly, no.

7  Q.  Who asked whom to describe their sexual experience?

8  A.  The defendant asked Cari to describe sexual experience.

9  Q.  Did Cari ever ask the defendant to describe his sexual

10  experience?

11  A.  No.

12  Q.  Who described to whom what they wanted to do sexually to the

13  other person?

14  A.  The defendant described to Cari.

15  Q.  Who described to whom what they wanted the other person to do

16  sexually to them?

17  A.  Can you repeat that, please?

18  Q.  Who described to whom what they wanted the other person to do

19  sexually to them?

20  A.  The defendant described that to Cari.

21  Q.  Did Cari ever ask the defendant to describe what he would do

22  sexually to her?

23  A.  No.

24  Q.  Did you believe, in your undercover capacity, that the

25  defendant was enticing, inducing, or persuading Cari to engage in

1  sexual activity?

2          MR. SADOW:  I'm going to object to what his opinion is,

3  whether what the defendant was doing was a violation of the

4  statute.

5          THE COURT:  Let me hear your question again.

6  BY MS. McBATH:

7  Q.  Did you, in your undercover capacity, believe that defendant

8  was enticing, inducing, or persuading Cari to engage in sexual

9  activity?

10          THE COURT:  You object?

11          MR. SADOW:  I do, Your Honor.

12          THE COURT:  I'll sustain the objection.

13          MR. JONES:  Those are all the questions I have, Judge.

14          MR. SADOW:  Your Honor, my recross will be very brief

15  and limited solely to what was asked on redirect.

16                    RECROSS-EXAMINATION

17  BY MR. SADOW:

18  Q.  And just to complete some of the redirect, if you'll go to

19  Exhibit 5E, which is the April 29th of 2008 Instant Message chat,

20  as labeled.  If you'll go to that same page, the 2:23 p.m. entry.

21  Do you see where you say, "I've never been this way with

22      someone your age or online stuff, little nervous"?

23  A.  Yes.

24  Q.  And the defendant says, "Me, too," correct?

25  A.  Yes.

1  Q.  And says, "I'm nervous, too," correct?

2  A.  Yes.

3  Q.  Okay.  And then when you go to the May 30th chat, which would

4  be 5F --

5          THE COURT:  5 what?

6          MR. SADOW:  5F, Your Honor.

7  BY MR. SADOW:

8  Q.  And if we go to the time of 4:34:44.  This is where you say,

9      I have to say I'm just a little scared because we

10     only talk online, but also excited," correct?

11  A.  Yes.

12  Q.  The defendant says, "I'm the same way," correct?

13  A.  Yes.

14  Q.  And then says, "I've never done something like this,"

15     correct?

16  A.  Yes.

17  Q.  And finally we go back in time to 5D, what has been referenced

18  as part of the bra-and-panties IM.  Go to the very top, 2:58:22.

19  A.  Yes.

20  Q.  The defendant says, "Oh, they were sexy..but I mean..

21     would you take a pic of you in just bra and panties?"

22     right?

23  A.  Yes.

24  Q.  And then you go -- she says, "I don't know."

25     The defendant says, "You don't have to at all,"

1              right, "just an idea.  You know I'd love it,"

2              correct?

3     A.   Yes.

4     Q.   And you say, "Got to think about that one.  Starting

5              to trust you, but you know."

6              He says, "Yes, I understand."

7              And then he says, "I have an idea."

8              You say, "Okay."

9              The defendant says, "Why don't you take some sexy

10             pics...but don't send them to me until you trust

11             me," right?

12    A.   Yes.

13    Q.   But the conversation here is sending pictures, correct?

14    A.   Yes.

15    Q.   And when we talked about the other ones -- you've already

16    agreed with me that throughout the month of May and June there was

17    no reluctance or resistance or unwillingness on the part of you,

18    in your undercover capacity, correct, you agreed with that once

19    before?

20    A.   I believe so, yes.

21    Q.   Okay.  Because what you had in April of '08 was conversation

22    amounting to sex online in kind of a chatting and pictures, right?

23    The serious plans to meet to engage in actual sexual activity

24    didn't take place until May and June, did they?

25    A.   The direct activity of making the actual plans, no.

1  Q.  Right.  That is, to engage in sexual activity, those plans

2  were not made until May and June, correct?

3  A.  The definite plans, no.

4          THE COURT:  When was that first mention about Atlanta?

5          THE WITNESS:  I'd have to go back and review.  But the

6  Atlanta started in -- it was in April at one point.  I couldn't

7  tell you without going back through it, when it was first

8  mentioned.

9          THE COURT:  When did you first learn that -- when did

10  you first disclose that this individual, this young woman, was in

11  Georgia, do you remember?

12          THE WITNESS:  That was in -- I believe that was going to

13  be in the first chat, sir.  That's going to be right in the very

14  beginning.

15          THE COURT:  Middle of April?

16          THE WITNESS:  Yes, the 17th of April.

17          THE COURT:  Any more questions?

18          MR. SADOW:  No, Your Honor.

19          MS. McBATH:  No, Your Honor.

20          THE COURT:  Thank you.

21          THE WITNESS:  Thank you, sir.

22                          [the witness steps down]

23          THE COURT:  Let's take a 15-minute break before we take

24  up the next witness.

25          THE CLERK:  All rise, please.  This Honorable Court's in

1  recess for 15 minutes.

2          [a recess was taken from 2:49 p.m. until 3:12 p.m.]

3          THE COURT:  Who would you have next, Ms. McBath?

4          MR. PAUL JONES:  Your Honor, at this point the

5  Government calls Investigator Anthony Stack.

6          THE CLERK:  Sir, if you would come around to the witness

7  stand, please.  Face me and raise your right hand.

8                          ANTHONY STACK,

9   called as a witness by the Government, after having first been

10  duly sworn, testifies as follows:

11          THE CLERK:  Be seated, please, and state your name for

12  the record.

13          THE WITNESS:  Anthony Stack; S-T-A-C-K.

14                       DIRECT EXAMINATION

15  BY MR. JONES:

16  Q.  How are you employed?

17  A.  I'm employed with Cook County Sheriff's Police Department in

18  Illinois.

19  Q.  What is your title with the Cook County Sheriff's Police

20  Department?

21  A.  I'm an investigator.

22  Q.  How long have you been with the Sheriff's Police Department in

23  Cook County?

24  A.  Seven years.

25  Q.  And how long have you been an investigator?

1   A.  For the past two years.

2   Q.  And what are your current duties?

3   A.  I'm currently assigned to the Cook County Sheriff's Police

4   Child Exploitation Unit.  Well, basically we investigate

5   internet-related crimes against children.

6   Q.  How long have you been performing this work?

7   A.  For the past two years.

8   Q.  What type of training have you received in order to work in

9   the Child Exploitation Unit?

10  A.  We receive ongoing training from the Illinois Crimes Against

11  Children Task Force, going to seminars, and also I just recently

12  had a 40-hour peer-to-peer training class.  The training is

13  ongoing.

14  Q.  Is peer to peer a type of computer program?

15  A.  That's correct.

16  Q.  Okay.  As part of your job duties, do you log onto the

17  internet posing as a minor child?

18  A.  I do.

19  Q.  And at some point in April 2008 did you encounter a person

20  using the screen name Jeffinsonoma77?

21  A.  Yes, I did.

22  Q.  And where did you encounter this individual?

23  A.  It was in an AOL AIM Instant Message chatroom.  It was a teen

24  chatroom.

25  Q.  Okay.  "AOL," what does that stand for?

1  A.  AOL?

2  Q.  You used "AOL AIM."

3  A.  It's AIM.  AIM stands for AOL Instant Messenger.

4  Q.  Okay.  And what does "AOL" stand for?

5  A.  It's just a service provider.

6  Q.  Is that America Online?

7  A.  Yeah.

8  Q.  Okay.  Were you able to eventually learn the identity of the

9  person using the screen name Jeffinsonoma77?

10  A.  That's correct.

11  Q.  And what was the identity of that person?

12  A.  Jeffrey Nickel.

13  Q.  Okay.  And what was the date that you first encountered the

14  defendant using this screen name Jeffinsonoma77?

15  A.  It was April 22nd, 2008.

16  Q.  And how did you actually communicate with the defendant on

17  that date?

18  A.  It was through -- AIM is the messenger.  Basically we go into

19  a -- I would go into a chatroom.

20  Q.  What type of chatroom did you go into?

21  A.  It was a teen chatroom.

22  Q.  Okay.

23  A.  And when I go into the chatroom I just sit silently and --

24  there's people that talk in the chatroom.  I don't talk in the

25  chatroom.  I wait until someone actually sends me an Instant

1  Message to talk to me privately, and that's what occurred with

2  Mr. Nickel.

3  Q.  Okay.  When you were in the chatroom, did you have a screen

4  name that you were using?

5  A.  I did.

6  Q.  What was that screen name?

7  A.  SweetlittlesusyQ.

8  Q.  Is that the name you used throughout all your communications

9  with the defendant posing as Jeffinsonoma77?

10  A.  That's correct.

11  Q.  Okay.  At any point did you tell the defendant what the age of

12  SweetlittlesusyQ was?

13  A.  I did.  It was on our first chat right off the bat.  He knew

14  that I was 14 and he advised me that he was 30.

15  Q.  Okay.  And in that first chat was there any discussion of

16  sexual experience?

17  A.  There was.  He had asked me if I was a virgin.  He had asked

18  me if I had -- pardon my language -- if I had sucked a man's dick

19  before.  If a man had --

20  Q.  What was your response to those questions?

21  A.  That no, I did not.  I was a virgin.

22  Q.  Okay.  Throughout your contact with the defendant posing as

23  Jeffinsonoma77 did you preserve the communications with him?

24  A.  I did.  They were archived as well as copied and pasted onto a

25  Word document.

1  Q.  Okay.  And the process of preserving these communications --

2  and were these all Instant Messages or were they emails or both?

3  A.  They were Instant Messages.  The only thing that was done

4  through emails were the pictures that were sent.

5  Q.  Okay.  So in the process of preserving the Instant Messages,

6  did you change any of the content of the communications?

7  A.  I did not.

8  Q.  Okay.  And let me show you what's been marked for

9  identification as Government's Exhibit 23.  Investigator Stack,

10  have you looked at Government's Exhibit 23?

11  A.  I have.

12  Q.  And what is Government's Exhibit 23?

13  A.  It's a copy of all the chats that we had between myself and

14  Mr. Nickel.

15  Q.  Have you reviewed the contents of Exhibit 23?

16  A.  I have.

17  Q.  And does that contain all the Instant Message communications

18  between the defendant and you posing as SweetlittlesusyQ?

19  A.  Yes, it does.

20  Q.  Okay.  And have those communications been altered in any way?

21  A.  They have not.

22        MR. JONES:  Okay.  And, Your Honor, at this point I'm

23  going to move for the admission of Exhibit 23, as well as 23A

24  through L, Exhibits 24 and 25, and that's going to complete all the

25  exhibits.

1          THE COURT:  All right.  They're admitted.

2          MR. JONES:  Thank you, Your Honor.

3   BY MR. JONES:

4   Q.  So you reviewed Government's Exhibits 23A through 23L also?

5   A.  Correct.

6   Q.  And what are those?

7   A.  Basically those are the chats broken down by days.

8   Q.  And do they contain accurate copies of the communications

9   between Jeffinsonoma77 and SweetlittlesusyQ?

10  A.  They do.

11  Q.  Are they also a subset of Exhibit 23?

12  A.  Yes.  They're broken down individually.

13  Q.  Exhibit 23 is the entire --

14  A.  23 is the entire collection, correct.

15  Q.  And I should pass these out.

16          Now, at some point did - at some point did the defendant

17  provide a photograph of himself to you posing as a minor child?

18  A.  Oh, yes, he did.

19  Q.  Okay.  And when was that?

20  A.  It was on the first chat.

21  Q.  Okay.  I'm looking for -- here we go -- what's already been

22  marked and admitted as Government's Exhibit 6.  Do you recognize

23  Exhibit 6?

24  A.  Yes.  That's the photo that he had sent to me.

25  Q.  Did he send any other photos to you throughout the --

1    throughout your communications?

2    A.  He did not.

3    Q.  Okay.  Did you provide any photos to him?

4    A.  I did.

5    Q.  Let me show you what's been marked for identification as

6    Government's Exhibits 24 and 25.  Did he ask for a picture of you?

7    A.  He did.

8    Q.  And did you provide one?

9    A.  Yes, I did.

10   Q.  I'm going to show you Exhibits 24 and 25.

11   A.  Yes, that's the picture.

12   Q.  Do you recognize those?

13   A.  Yes, I do.

14   Q.  What are they?

15   A.  Those are pictures that I had sent to Mr. Nickel.

16   Q.  And was this in the first --

17   A.  The first chat, correct, on the 22nd of April.

18   Q.  Okay.  This photo has been kind of -- has been blown up.  Is

19   that correct?

20   A.  That's correct.

21   Q.  So it actually looks kind of grainy here.  Is that the size it

22   was sent in?

23   A.  Negative.  The size is smaller.

24   Q.  And is this -- this is what was actually sent?

25   A.  That's correct.

1  Q.  And it was sent to Jeffinnorthbay077.  How did you know to

2  send it there?

3  A.  That's the email address that was provided to me.

4  Q.  Okay.  Now, if I could ask you to go to Exhibit 23A first

5  behind the collection --

6  A.  Yes.

7  Q.  -- of the tabs.

8        Okay.  This is the - this is the one that's April 23rd,

9  2008.  Again, what was the date of your first communication?

10 A.  April 22nd.

11 Q.  Okay.  If I can ask you to turn to Page 3.  Do you see the

12 part where the defendant's asking you, "Bra and panties

13       on"?

14 A.  Yes.

15 Q.  And your response was, "No bra"?

16 A.  Yes.

17 Q.  Is this -- was this the first time that he had asked you if

18 you were wearing bras and panties?

19 A.  It was not.

20 Q.  Okay.  In any subsequent communications did he ask the same

21 questions to you?

22 A.  Yes, he did frequently.

23 Q.  Okay.  And then if you look at the bottom of the page and what

24 continues on to the top of Page 4, "I thought about you

25       when I went to bed last night.  Just thought that

1           it would be cool to sleep with you."

2       At that point had you already had conversations with the

3   defendant that were sexual in nature?

4   A.  Yes, we did.

5   Q.  And if I can ask you now to turn to Page 6.  What's the

6   general discussion of the highlighted portion on Page 6?

7   A.  This was where he was talking about himself taking pictures of

8   me.

9   Q.  And is this - is this an iso -- is this the only time he asked

10  about taking pictures of you?

11  A.  No.  He frequently asked to take pictures of me as well, both

12  with clothes on and unclothed.

13  Q.  Okay.  And then at the bottom, what type of clothing is he

14  asking you to wear?

15  A.  Specifically a thong.

16  Q.  Did he ever mention that again?

17  A.  Yes, he did.

18  Q.  And does that continue on to the following page, Page 7?

19  A.  That's correct.

20  Q.  And does that continue on to the top of Page 8 where he's

21  asking about a thong again?

22  A.  Correct.

23  Q.  If you go to Page 10, the highlighted portion, what's he

24  saying there?

25  A.  "I kinda want to be your boyfriend."

1  Q.  Okay.  Is that what you understand "BF" to be?

2  A.  Yes.  "BF" is understandable to be boyfriend.

3  Q.  Okay.  And is this the way that people -- as part of your job,

4  do you go into a lot of chatrooms?

5  A.  Yes, we do.

6  Q.  And do you observe conversations that people are having in

7  chatrooms?

8  A.  Yes.

9  Q.  Is this the way that people actually communicate?  There's a

10 lot of shorthand.

11 A.  They do.  It's shorthand, exactly.

12 Q.  Okay.  On the following page, again the defendant is saying,

13        "Not many 14 year olds would be serious about

14        meeting a 30 year old guy."

15    When did you first tell the defendant that you were 14 years

16 old?

17 A.  On our first conversation.

18 Q.  So the previous one?

19 A.  Yes, on the 22nd, correct.

20 Q.  Okay.  Okay.  And then if you can look at the top of the

21 following page, Page 12.  Did it seem to you at that point that

22 the defendant was aware of any problems in having a relationship

23 with a 14-year-old?

24 A.  Yes, it did.  Basically the conversation was going toward if I

25 would tell anyone if he had showed up, because he didn't want to

1  get in trouble.  I explained to him that I wasn't going to tell

2  anyone because I didn't want to get in trouble myself.

3  Q.  All right.  And if I can ask you to turn to the next page,

4  Page 13.  If we look at the middle of the page and what continues

5  on to Page -- the top of the next page, Page 14, what is the

6  nature of the conversation here?

7  A.  He was talking about taking pictures - taking pictures of me--

8  let me see if this is the one.  I'm sorry.

9  Q.  Well, we start in the middle of the page.

10  A.  Uh-huh.  Yes, it was -- this was where he was talking about

11  being in the hotel with me and what he would do with me in the

12  hotel, about taking my clothes off, laying with me naked.

13  Q.  Okay.  And does it continue on to the top of Page 14?

14  A.  Yes, it does.

15  Q.  And who initiated the conversations about any type of sexual

16  activity?

17  A.  The defendant, Mr. Nickel.

18  Q.  And as you continue reading to the bottom of Page 14, again

19  exactly what is it -- what's your understanding of the nature of

20  this conversation?

21  A.  It was all sexual in nature.  I explained to him that I've

22  never done anything before and he was explaining what he would do

23  and how he would teach me sexually what to do and exactly how he

24  would do it to me.

25  Q.  And is it more graphic than that?

1   A.  Yes.  I can read it, if you would like.

2   Q.  The Court's heard a little bit from a previous chat, so I

3   think we can just move on to the next tab, Exhibit 23B.

4          So if you look at 23B, is that the next day from the

5   previous chat?

6   A.  Yes.

7   Q.  Okay.  And here the defendant is -- at the bottom he says,

8          "I want to teach you what you don't know."

9      Is that the only time the defendant offered to teach Susy?

10  A.  Negative.  He offered that on multiple occasions.

11  Q.  And again if we turn to Page 4, if you can look at the

12  highlighted portion on Page 4.  What is the nature of the

13  discussion that the defendant's having with Susy?

14  A.  He says, "You'd trust me if we were alone...naked in

15          bed together?"

16      He would ask if I was ready.  Basically he was talking about

17  having sex with me.  More graphic than that, of course.

18  Q.  More graphic than that.  That's fine.

19          And let me ask you to go to the next exhibit, 23C.  First

20  of all, this is a slightly different format from what we've seen

21  before.  How were these messages preserved here?

22  A.  This is the archived format.  The other format that you see in

23  the other chats are the copy and paste on the Word document.

24  Q.  Okay.

25  A.  So that's the reason they're different.

1  Q.  All right.  Let me ask you -- so this first one starts on

2  April 28th?

3  A.  Correct.

4  Q.  And so it's been about a week or so since you've first

5  encountered the defendant.  Is that correct?

6  A.  Yes, yes.

7  Q.  Okay.  And if you look at Page 4, when the defendant says he's

8  nervous and he's scared, what if Susy is scared and tells somebody

9  and he gets in trouble.  What does Susy promise to do in reaction

10 to the defendant expressing his nervousness?

11 A.  She says she's not going to tell anyone because she doesn't

12 want to get in trouble herself.

13 Q.  Okay.  I think the next chat, if you look at Page 10, is on

14 April 29th, 2008.  Is that correct?

15 A.  That's correct.

16 Q.  It would be the following day?

17 A.  Correct.

18 Q.  And if I can ask you to turn to Page 14.  What is the

19 defendant asking Susy here?

20 A.  He's asking her that when he does come see her if he can -- if

21 she would be able to spend the night with him.

22 Q.  At this point had the defendant stated what he does for a

23 living, has he told Susy what he does for a living?

24 A.  Yes.  I believe it was with computer software training.

25 Q.  Okay.  And did the defendant state -- tell Susy whether his

1   job required him to travel?

2   A.  It did.

3   Q.  Had Susy told him at that point where she lived?

4   A.  Correct.

5   Q.  What did she say?

6   A.  Chicago, Illinois -- or Brookfield.  I'm sorry.  Brookfield,

7   Illinois.

8   Q.  Okay.  And did she describe where that is in relation to

9   Chicago?

10  A.  I think she described it as being near Brookfield Zoo, and he

11  said he was aware of where Brookfield Zoo was.

12  Q.  Okay.  And at this point had the defendant made any mention to

13  business trips to Chicago being planned?

14  A.  Yes.  He had said he had one planned for the end of June -- or

15  I'm sorry.  I think it was the end of May.

16  Q.  Okay.  And if I can get you to turn to the next page, Page 15.

17  A.  Uh-huh.

18  Q.  The highlighted portion at the bottom that goes on to the top

19  of Page -- or for most of Page 16 -- first of all, it starts off

20  with, "If we do have sex, do you want he to use a

21        condom?"  What was Susy's response?

22  A.  "Um, yeah.  I don't want to get pregnant, silly."

23  Q.  What was "silly"?

24  A.  "Silly" was the nickname that Susy had given Mr. Nickel.

25  Q.  So every time we see "silly" here that's just her nickname for

1  him?

2  A.  Correct.

3  Q.  Okay.  And did he have a nickname for her?

4  A.  Cutie.

5  Q.  Okay.  Did -- and then if you look at the top of Page 16, did

6  the defendant have any idea for any type of sexual activity that

7  would not involve condoms?

8  A.  Yes.  He was explaining to her that there's a way you can't

9  get pregnant without using condoms and that would be anal sex.

10  Q.  Okay.  If I can ask you to turn to Page -- the chat that's on

11  Page 19 that starts on Thursday, May 1st.  Is that correct?

12  A.  Correct.

13  Q.  Okay.  And when you archived these did you automatically

14  record the dates?

15  A.  Yes.

16  Q.  Okay.  So the dates that are here are actually the ones that

17  are preserved by AIM, AOL Instant Messaging?

18  A.  That's correct.

19  Q.  Okay.  If I can ask you to look at the next page where the

20  defendant's asking,  "What are you wearing today?"

21      "Blue jeans and a brown shirt."  Is this another example

22  of the defendant talking about -- asking Susy what she's wearing?

23  A.  That's correct.  In almost every single chat, when we started

24  he would ask what I was wearing.

25  Q.  Okay.  And if I can ask you to turn to Page 25.  And that's

1   the chat that starts on Friday, May 2nd?

2   A.  Correct.

3   Q.  And then it starts actually -- what I wanted to focus your

4   attention on is Page 26, the bottom of Page 26 that goes to the

5   top of Page 27.  What is the defendant talking about here?

6   A.  He's talking about buying her stuff prior to going to the

7   hotel when he comes in to meet her.

8   Q.  So is there still a discussion at this point about the

9   defendant's impending visit?

10  A.  Correct, there is.

11  Q.  And I wanted to ask you:  What is the -- what was the

12  timeframe that you actually had discussions with the defendant?

13  Would it be any time of day or night?

14  A.  No.  Primarily it was -- between the hours of 8:00 to 4:00 I

15  was in school.  In the daytime we would talk prior to me going to

16  school and then after I got off from school.  But there were

17  offers to talk to him later on in the evening, but he declined

18  saying that he's only on usually during the daytime hours.

19  Q.  Okay.  Did you ever talk on the weekends?

20  A.  No, we did not.

21  Q.  So it's all weekdays?

22  A.  Correct.

23  Q.  Okay.  Can I ask you to go to Page 37, which starts the next

24  chat, Wednesday, May 14th, 2008.  If you go to the next page, on

25  Page 38, actually, I want to direct your attention to that.

1  A.  Sure.

2  Q.  Jeffinsonoma77, the defendant says, "I am going to

3       stay right by the Brookfield Zoo."

4     Does that refer earlier to what you had said where you had

5  told the defendant near where you lived?

6  A.  That's correct.  I told him I lived in Brookfield right near

7  the zoo.

8  Q.  Is that in or near Chicago?

9  A.  Yeah, it's not far from Chicago.

10  Q.  Is Brookfield a suburb?

11  A.  Yes.

12  Q.  Okay.  On the next page, what did the defendant initially

13  think your age was?

14  A.  In this conversation he explains that he never kissed a 13

15  year old.  I corrected him and told him that I was actually 14 and

16  not 13.

17  Q.  At any point did he ever ask you if you were 16 years old?

18  A.  Never.

19  Q.  And if I can ask you to go to the next page, Page 40, the

20  defendant says at the bottom, "I do really want to be

21       your first though if you feel comfortable with

22       me."

23     And I think if you look at the top of Page 41, what does he

24  mean when he says "I want to be your first"?

25  A.  He's talking about the first person that I would have sex

1   with.

2   Q.  Okay.  And what is the legal age of consent in Illinois?

3   A.  Seventeen.

4   Q.  Is it legal for a person who is above the age of 18 to have

5   sexual intercourse with a 14-year-old?

6   A.  It is not.

7   Q.  Okay.  And on Page 41 again he mentions use of a condom?

8   A.  Yes.

9   Q.  Okay.  And does he come up with another way to have sex

10  without a condom?

11  A.  Yes.  He explains that he can pull out early and come on my

12  body or tits.

13  Q.  Okay.  And if I can ask you to turn next to Exhibit 23D, it's

14  going to be the next tab.  And this is the one that takes place on

15  May 19th, 2008.  At this point what were you expecting?

16  A.  He was supposed to be coming in this week.

17  Q.  Okay.  And did he tell Susy where he was going to be staying?

18  A.  Yes.  He advised me he was staying at the Carlton Hotel.

19  Q.  And that's what's shown in the highlighted area on Page 1?

20  A.  Correct.  He sent me a link to the hotel.

21  Q.  Where were you supposed to -- if you look -- especially if you

22  go to Page 2, where were you supposed to meet him?

23  A.  We were supposed to meet at the Burger King that's in

24  Brookfield.

25  Q.  And what time?

1   A.  3:00 o'clock.

2   Q.  So you had already set up the arrangements to meet him at the

3   Burger King?

4   A.  Correct.

5   Q.  Now if I can ask you to go to Exhibit 23E, which is behind the

6   next tab.  This takes place on May 20th, 2008.  Was he supposed to

7   be there that day, do you recall offhand?

8   A.  I believe that was - that was the day he was flying in.

9   Q.  Okay.  And can I ask you to look at Page 3?

10  A.  Uh-huh.

11  Q.  Do we have a third time he's asking if he should bring a

12  condom?

13  A.  That's correct.

14  Q.  And then if I can ask you to go to Tab 23F.

15        "See you at 3, K."

16      Was that, again, supposed to be the time he was supposed to

17  be there?

18  A.  Yes.  This was actually the day that the meet was supposed to

19  happen.

20  Q.  And does everybody always write -- from what you've seen being

21  in chatrooms, always write "K" for okay?

22  A.  That's correct, shorthand.

23  Q.  Let me ask you to go to the next tab, which is 23G.  Here we

24  have SweetlittlesusyQ saying, "Thanks a lot.  I thought

25      you said you were serious.  I sat there for an hour

1        like an idiot."

2        What happened?  Well, first of all, this is May 21st.  What

3   was supposed to happen May 21st?

4   A.  This is the day of the meet.

5   Q.  Okay.  And so what happened that day?

6   A.  On the day of the meet myself, agents that I worked with,

7   along with agents with the FBI, set up surveillance around the

8   Burger King.  We were there for approximately an hour and a half

9   waiting for Mr. Nickel to show up.

10  Q.  How many of you showed up there?

11  A.  Approximately 10 of us.

12  Q.  Okay.

13  A.  We waited there for about an hour and a half.  After the

14  subject didn't show up, we came back to the office.  That's when I

15  went online and sent an offline message back to Mr. Nickel.

16  Q.  What do you mean an offline message?

17  A.  That means he wasn't on at the time I went on.  I sent him an

18  Instant Message.  Since he's not on, he doesn't receive it

19  immediately.  When he comes back online, that'll pop up in his

20  message box.

21  Q.  Okay.  So you can type it and it will just be delivered later?

22  A.  Correct.

23  Q.  Like an email almost?

24  A.  Yes.

25  Q.  Okay.  Through your investigation of this case, did you ever

1  learn if the defendant had actually traveled to Chicago on May

2  21st or not?

3  A.  Yeah.  Later, through the investigation, we actually found out

4  that Mr. Nickel actually wasn't in Chicago at the time, that he

5  was still in Kentucky.

6  Q.  Okay.  Let me ask you to go to Exhibit 23H, the next tab.

7  This occurred the day after the meeting did not occur, May 22nd,

8  2008.  Is that correct?

9  A.  That's correct.

10  Q.  What explanation did the defendant offer for not meeting with

11  Susy on May 21st?

12  A.  The defendant apologized and said that he was at a meeting

13  working late and there was no way he could get a message to me

14  explaining that he wasn't going to be able to be there.

15  Q.  Okay.  And was that the only explanation he ever offered?

16  A.  At this point, yes.  Later on he did explain to me that the

17  real reason for him not showing up was that he was nervous.  He

18  thought that I might be a cop.

19  Q.  Okay.  So let me ask you, then -- if we can go to Exhibit 23I,

20  which is behind the next tab.  It's May 27th, 2008.  Is that

21  correct?

22  A.  That's correct.

23  Q.  And that's actually quite a few days after you were supposed

24  to meet.  And at the back -- at the bottom, it's not highlighted,

25  at the bottom of Page 1 does Susy refer to where they were

1   supposed to meet, where the meeting was supposed to take place?

2   A.  Yes.  She explains that "you didn't show up at Burger

3       King."

4   Q.  And that "you didn't want to talk to me."

5       Let me ask you to go to Page 3, please.  Now, what is the

6   defendant saying here?  And it continues on to the next page.

7   Well, what is the defendant saying on Page 3?

8   A.  This is basically where he's telling me that he was in

9   Chicago, that he did get tied up at a meeting, but he probably

10  could have seen me, if he wanted to.  He said he was terrified,

11  that he thought I was a cop.  He compared it to the Dateline

12  series that he had probably seen on TV.

13  Q.  What's your understanding of the Dateline TV series?

14  A.  That's the "To Catch a Predator" series that Dateline had

15  showed where people would show up and get arrested for trying to

16  meet 13-year-old girls on the internet.

17  Q.  Okay.  And on the next page, Page 4, is he referring to if she

18  were a cop, the type of person that he thought she -- or the type

19  of trouble that he would be in?

20  A.  Yeah.  He said he would be in "huge trouble" and specifically

21  "legal trouble."

22  Q.  Okay.  And he says -- the last thing that's highlighted,

23      "I didn't think that after talking to you on the

24      phone."

25    Can you please explain what he meant "after talking to you on

1   the phone"?

2   A.  There was an undercover phone call that took place between

3   Mr. Nickel and an investigator in our office.  This occurred, I

4   believe, on the 22nd of May, the day after the meeting was

5   supposed to take place.  It was a brief conversation.  She was in

6   school at the time in between classes.

7   Q.  That was the -- you mean the undercover was pretending?

8   A.  Correct, yeah.

9   Q.  Okay.  How did she know how to contact the defendant?

10  A.  The defendant gave her his cellphone number.

11  Q.  Okay.  And after that call did the communications continue?

12  A.  Yes, they did.

13  Q.  Okay.  And then if you go to Page 5, what's he asking the

14  defendant to do -- excuse me.  What's he asking Susy to do?

15  A.  He's basically asking -- he's looking for more confirmation.

16  He's asking her to send a picture of herself to the defendant, but

17  he wants her to hold up a piece of paper in the picture stating

18  "Hi Jeff."

19  Q.  Did Susy agree to do that?

20  A.  She agreed to do that on the stipulation that he send -- he

21  was going to send a confirmation of his itinerary when he was

22  coming back into town.

23  Q.  Okay.  And at the top of Page 6, it's not highlighted, but

24  Susy says, "We can talk on the phone, K."

25          Did they have -- and the next line refers to actually

1  she's going to keep the photograph as you explained.  Did they

2  have any more telephone communications?

3  A.  They did not.

4  Q.  Was the -- okay.  Let me ask you to go to Exhibit 23J and at--

5  and this is not highlighted.  If I could ask you to go to Page 2.

6  But I'm looking at the middle -- near the middle portion.  Did the

7  defendant say he was coming to Chicago at any point?

8  A.  Yes, he did.

9  Q.  What were the dates that the defendant told Susy he would be

10  in Chicago?

11  A.  From June 30th to July 3rd and then he corrected himself and

12  said that he actually would be there on the 29th.

13  Q.  And if you look down towards the bottom, it's four, five lines

14  from the bottom.

15  A.  Uh-huh.

16  Q.  How was Susy supposed to know if the defendant was really

17  coming?

18  A.  The defendant stated that when he made his flight and hotel

19  arrangements, he would forward the itinerary to her.

20  Q.  Okay.  And if I can ask you to look at the next page.  Again

21  is there another question about should he bring condoms?

22  A.  That's correct.  And once again she states that she doesn't

23  want to get pregnant.

24  Q.  Okay.  Can I ask you to turn to Exhibit 23K.  Now we're in

25  June.  Is that correct?

1   A.  That's correct.

2   Q.  And if you look to page -- look at Page 2, again what's the--

3   the defendant's asking for her bra size.  What does Susy tell him?

4   A.  "32B."

5   Q.  He's also asking what she was wearing that day.  Is that

6   correct?

7   A.  Yes, that's a common occurrence.  Yeah, he's always asking

8   what she's wearing; bra, panties.

9   Q.  Okay.  When he asked you generally "what are you wearing,"

10  what did you, as Susy, respond?  Did you go straight to bra and

11  panties?

12  A.  No.  I would explain I was either wearing shorts and a

13  T-shirt, pants and a shirt, and then he would go on to say, "Well,

14  bra and panties?"

15  Q.  Okay.  He said what size, referring to bra size --

16          "What size are you again, baby?" Had he asked you

17          previously?

18  A.  He had asked me previously, correct.

19  Q.  Okay.  If I can get you -- I omitted putting another tab in

20  here.  If you turn to the next page that actually starts a chat

21  that took place on June 11th, 2008.

22  A.  Uh-huh.

23  Q.  And if I can get you to turn to Page 2 of that.  What's he

24  doing there at the bottom?

25  A.  Once again he's asking what I'm wearing today.  I explain to

1  him that I'm wearing shorts and a purple tank top, and he asked me

2  if I'm wearing bra and panties.

3  Q.  And what does he ask again at the top of the next page?

4  A.  He asked me what size - what size -- what's my bra size.

5  Q.  Okay.  And can you look at Page 4, please, the highlighted

6  portion.  What is the defendant talking about here?

7  A.  The defendant is basically talking about he can't wait to kiss

8  me and that he wants to teach me a lot.  He asked me if there's

9  anything off limits.  I tell him, "You know that thing."

10      And he responds, "Right..anal sex."

11      I said, "Yeah."

12      He says, "I promise I won't."

13  Q.  Okay.  And then finally the last exhibit, Exhibit 23L, June

14  12th, 2008.  What did the defendant tell Susy he bought for her?

15  A.  Thongs.

16  Q.  Did the defendant still believe that Susy was a virgin?

17  A.  Yes, he did.

18  Q.  And can I ask you to go to Page 4 then.  At the top of Page 4

19  is the defendant expressing an interest in having sexual

20  intercourse?

21  A.  Yes, he did.  Basically he explains that since I am a virgin

22  and because of the fact that he's well endowed, that it might hurt

23  when we have sex the first time.

24  Q.  And did he use the phrase "well endowed"?

25  A.  No.  Actually, he said he had a "pretty big dick."

1   Q.  Okay.  And then later down he says, "Do you think

2        you'd want to be my GF?"

3        What's your understanding of "GF"?

4   A.  Girlfriend.

5   Q.  What did Susy say?

6   A.  "I kinda thought I already was."

7   Q.  Okay.  And what happened in that part of the conversation

8   afterwards?

9   A.  At that point Mr. Nickel says that he's not going to make it

10  official until we see each other for real, but that he kind of

11  thinks of me as his girlfriend, too.  He asked if I will -- and

12  then he does ask if I will shower with him.

13  Q.  On Page 9 does the conversation become more explicit?

14  A.  It does.

15  Q.  And so what's your understanding of the type of activity that

16  the defendant wanted to have with Susy?

17  A.  Basically he wanted her to perform oral sex on him and he was

18  going to teach her how to do it.  At which point --and then he

19  asked if she'd ever seen a man come before and --

20  Q.  Is there more discussion about that?

21  A.  Yes.  He then says -- basically what he said,

22        "So..would it freak you out if you were sucking my

23        cock and I came in your mouth?"

24        She asked if it tastes yucky.

25        He says there's not much taste at all.

1   Q.  She writes down, "Maybe IDK."

2   A.  I'm sorry.  Yeah.  "IDK" is short for I don't know.

3   Q.  So "Maybe, I don't know.  Does it taste yucky?"

4   A.  Right.

5   Q.  And he responds to that question?

6   A.  He says, "Doesn't have much taste at all."

7       Then he responds, "But you should probably stroke

8       my dick and watch me come before you take it in

9       your mouth."

10  Q.  What's he asking at the bottom of the next page, Page 10?

11  A.  "Do you think you could fall in love with someone

12      my age?

13  Q.  And what does Susy respond?

14  A.  "Yes."

15  Q.  Is this the last communication between Susy and the defendant?

16  A.  It was.

17  Q.  Did you -- did Susy ever try to contact the defendant after

18  this date?

19  A.  No.  She went online, but the defendant was never online.

20  Q.  Okay.  And did you, as Investigator Stack, investigate why the

21  defendant was not responding?

22  A.  Yeah.  It was probably a week later -- I remembered the

23  defendant saying that he was going to a couple different states.

24  He was going to Atlanta, California.  I started running the

25  subject through those states at which time, when I ran him through

1  Atlanta, he came up with an arrest out of Atlanta, Georgia.

2  Q.  Okay.

3  A.  I'm sorry.  It wasn't Atlanta, Georgia.

4  Q.  So that concluded your portion of the case at that point?

5  A.  Yes, it did.

6       MR. JONES:  Okay.  If I could have just one moment, Your

7  Honor.

8       THE COURT:  Yes, sir.

9       MR. JONES:  I have no further questions at this time,

10 Your Honor.

11      THE COURT:  All right.  Cross-examination, Mr. Sadow?

12      MR. SADOW:  Yes, Your Honor.

13                     CROSS-EXAMINATION

14 BY MR. SADOW:

15 Q.  Good afternoon to you.  I intend to be very brief.

16      If I understand correctly, the defendant did not send you

17 any nude photos.  Is that correct?

18 A.  That's correct.

19 Q.  Did you request them?

20 A.  I did not.

21 Q.  If I understand correctly, there was a meet scheduled -- that

22 is, a meeting between the defendant and you, in your undercover

23 capacity, scheduled for May the 21st, 2008.  Is that correct?

24 A.  That's correct.

25 Q.  And leading up to that meet on May 21st, 2008, at least within

1  a day or two of that, the defendant indicated that he was in

2  Chicago.  Is that correct?

3  A.  That's correct.

4  Q.  Which turned out to be a lie, correct?

5  A.  Correct.

6  Q.  And the defendant indicated that he was going to meet with you

7  on the 21st of May and didn't show up, correct?

8  A.  Correct.

9  Q.  And it was subsequent to that that you found out, through your

10 investigation, that the defendant had not come to Chicago,

11 Illinois, correct?

12 A.  Correct.

13 Q.  That he was still in Kentucky in or on May 21st, 2008,

14 correct?

15 A.  Correct.

16 Q.  So whenever the defendant, throughout the IM chats for the

17 date of May 20th or May 21st, indicates that he's in Kentucky --

18 I'm sorry, he's in Chicago, that was a lie, correct?

19 A.  Correct.

20 Q.  At no time did the defendant ever tell you, in your undercover

21 capacity, that he had not gone to Chicago, correct?

22 A.  Correct.

23 Q.  He always indicated he had been in Chicago.  But on one

24 occasion he may have said he just didn't make the meet, then he

25 came up with an excuse that said he was too busy to make the meet,

1   and then he thought you were a police officer, correct?

2   A.  Correct.

3   Q.  The fact of the matter is:  He was never in Chicago and

4   wouldn't be able to make the meet under any circumstances,

5   correct?

6   A.  That's correct.

7   Q.  Okay.  And you knew that as you continued to converse with him

8   after May 21st, 2008 -- that is, you knew it from your undercover

9   work, from your investigation, that the defendant had not been in

10  Chicago, correct?

11  A.  That's correct.

12  Q.  And the defendant kept telling you in Instant Messages after

13  May 21st -- or at least gave reason to believe that the next time

14  when he comes to Chicago, it would be all scheduled and he'd meet

15  with you, correct?

16  A.  That's true.

17  Q.  Okay.  But if I understand correctly, at least as a result of

18  his arrest in this case, the defendant did not come to Chicago at

19  any time to meet with you in your undercover capacity, correct?

20  A.  That's correct.

21  Q.  So what we have, if I can just kind of characterize it, you've

22  got a lot of sexually graphic talk through Instant Messaging,

23  correct?

24  A.  Correct.

25  Q.  With no nude or one would call obscene photos being sent,

1  correct?

2  A.  Correct.

3  Q.  With no meet with anyone purported to be -- I'm sorry, an

4  under age individual, correct?

5  A.  An actual meet that took place?

6  Q.  Right.

7  A.  No.

8  Q.  Or the defendant actually traveling to Chicago in an

9  arrangement to actually do the meet, correct?

10 A.  Actually traveling, no.

11 Q.  So you've got a lot of talk, Instant Messaging online?

12 A.  We have a planned meet, correct.

13 Q.  Planned?

14 A.  Uh-huh.

15 Q.  But you had a planned meet and he didn't come to Chicago,

16 right?

17 A.  Yes, which occurs oftentimes.

18 Q.  Okay.  But it happened here specifically?

19 A.  Specifically, yes.

20 Q.  And to finish this off, if we'll go to, please, what would be

21 tab Exhibit 23D, which in fact is the Instant Messaging chat of

22 May 20th, 2008, correct?

23 A.  23D?

24 Q.  I'm sorry.  23E.  My mistake.  I apologize.  23E.

25 A.  That's correct.

1   Q.   That is May 20th, 2008?

2   A.   May 20th, correct.

3   Q.   Which would be the day before the meet was to take place,

4   correct?

5   A.   That's correct.

6   Q.   If you'll go to Page 6, 2:46:09 p.m.  It's not highlighted.

7   In fact, nothing on that page is highlighted, is it?

8   A.   No, there's nothing highlighted.

9   Q.   But at 2:46:09 p.m. the defendant says, "You know,

10        we do not have to have sex tomorrow night."

11      It actually says "right," but it meant "tomorrow night,"

12   correct?

13   A.   Oh, I don't know.  It could have meant "tomorrow, right?"

14   Q.   Okay.  "We don't have to have sex tomorrow, right?"

15          That's what he says?

16   A.   That's correct.

17   Q.   And you say, "Oh," right?

18   A.   That's correct.

19   Q.   "If you want to...we totally can..but only if you

20        want," correct?

21   A.   That's correct.

22   Q.   Okay.  Then he goes on to say -- you go on to say,

23        "It's up to you, silly," correct?

24   A.   That's correct.

25   Q.   He says, "Will you be nervous?"

1        You say, "Yeah.  Will you?" correct?

2   A.  That's correct.

3   Q.  He says, "Yes.. I've never been with anyone your age,"

4   correct?

5   A.  That's correct.

6   Q.  Okay.  And that was, again, the day before the meet which

7   never takes place?

8   A.  Exactly.

9   Q.  All right.  And then 30 -- I'm sorry 23L, which is the Instant

10  Messaging chat of 6/12/08, correct?

11  A.  That's correct.

12  Q.  If you go to Page 3.  And essentially the Instant Messaging

13  chat is about making arrangements to see each other, correct?  I'm

14  just trying to get the context.

15  A.  No, that's fine.

16  Q.  Would that be reasonable?

17  A.  Yes.

18  Q.  Okay.  At 10:13:48 a.m. the defendant says,

19        "And I know I keep saying this..but I swear if you

20        don't want to have sex, it's ok."

21        And you respond, "I know but."

22        And the defendant says, "But..." with a question

23        mark, correct?

24  A.  Correct.

25  Q.  And you say, "I mean, you always talk bout, I mean."

 1          And then you continue, "It's important to you, yeah."

 2          And the defendant says, "But talk online and reality

 3          can be two different things," correct?

 4  A.  Correct.

 5  Q.  "I never want to pressure you or force you," correct?

 6  A.  That's correct.

 7          MR. SADOW:  That's all.  Thank you.

 8          MR. JONES:  If I can have very brief redirect, Your

 9  Honor.

10          THE COURT:  Yes, sir.

11          MR. JONES:  Thank you.

12                   REDIRECT EXAMINATION

13  BY MR. JONES:

14  Q.  Investigator Stack, can I ask you to turn to Tab 23H.  If you

15  look at the top there where Jeffinsonoma's talking, not the

16  highlighted portion, does he provide his cellphone number to Susy?

17  A.  Is this on 5/22/08, is that where we're at?

18  Q.  It is 5/22/08.  I'm asking you to go to Page 2.

19  A.  Oh, I'm sorry.  Yes, he did.

20  Q.  Okay.  Is that the number that you had the female undercover

21  agent call?

22  A.  That's correct.

23  Q.  Did he answer that number?

24  A.  He did.

25  Q.  Is that the first time he provided that number, that phone

1  number?

2  A.  It was.

3  Q.  Had any phone calls been made before that time?

4  A.  No.

5  Q.  And before that -- after this, did the defendant promise to

6  send Susy his travel itinerary once the plans were made?

7  A.  He did.

8  Q.  And before, he told her what hotel he would be staying at for

9  May 21st.  Is that correct?  When he was supposed to be coming May

10 21st, he told -- he said what hotel he was going to be staying in,

11 right?

12 A.  That's correct.

13 Q.  But did he ever send the itinerary?

14 A.  Not for that trip, no.

15           MR. JONES:  I have nothing further, Your Honor.

16           MR. SADOW:  I'm probably the only one who's confused.  I

17 want to make sure the last part of that was --

18                      RECROSS-EXAMINATION

19 BY MR. SADOW:

20 Q.  You knew the hotel that the defendant claimed he would be

21 staying at before the meet that was arranged for May 21st, 2008,

22 correct?

23 A.  That's correct.

24 Q.  After May 21st, 2008 the defendant did not provide the name of

25 a hotel, correct?

1   A.   Correct.

2   Q.   He didn't provide any actual travel plans, correct?

3   A.   An itinerary, no.   Travel plans, yes.

4   Q.   An itinerary as to when in fact he would be in Chicago, what

5   dates and where he'd be staying?

6   A.   The dates, not where he would be staying.

7              MR. SADOW:   Okay.

8              MR. JONES:   I have nothing further, Your Honor, of this

9   witness.

10             THE COURT:   Okay.   Anything more?

11             MR. SADOW:   No, Your Honor.

12             THE COURT:   You may go down.   Thank you, sir.

13             THE WITNESS:   Thank you, Your Honor.

14                     [the witness steps down]

15             MR. JONES:   Your Honor, at this time the Government

16  would ask that the Court take judicial notice of Georgia Statute

17  Section 16-6-4, which is the statute criminalizing child

18  molestation and aggravated child molestation.   This is the statute

19  that's also listed in the indictment.   I have a copy that I can

20  provide to the Court.

21             MR. SADOW:   I don't have any objection.

22             THE COURT:   Do you have any objection to that?

23             MR. SADOW:   No, no, Your Honor.

24             THE COURT:   The Court will do so.   I really didn't know

25  the Court had to take judicial knowledge of a statute.

1            MR. JONES:  I haven't dealt with this exact type of

2 thing, Your Honor.  And at this time, Your Honor, the Government

3 rests its case.

4            THE COURT:  All right.  The Government has rested.

5 What's your situation on this case, Mr. Sadow?

6            MR. SADOW:  Your Honor, we will not be presenting a

7 defense.  So to that extent, we would rest, which I guess closes

8 the evidence.

9            THE COURT:  Well, I must inform your client that he has

10 a right to testify.

11            MR. SADOW:  Yes, sir.

12            THE COURT:  Under the Constitution of the United States,

13 Mr. Nickel, you have an absolute right to take the witness stand

14 and testify on your own behalf.  It's your decision, not that of

15 your lawyer.  You should make the decision after giving due

16 consideration to the advice of your lawyer, and you do have a very

17 able lawyer.  But it's also appropriate that you yourself give

18 consideration to what you want to do and what you feel you should

19 do after listening briefly to what I have to tell you and then

20 thinking about it, talking about it, if you think appropriate, with

21 your lawyer.

22            If you were to take the witness stand and testify, you

23 would be subject to cross-examination after your attorney was

24 through examining you on direct, as it's called, when you first

25 testify.  You'd be subject to cross-examination, efforts to impeach

1  you, your credibility -- that is, your believability would be

2  judged just the same as any other witness in the case.

3       If a jury were trying this case, the Court would tell a

4  jury, if you did not take the witness stand, that they should draw

5  no inference whatsoever against you as a result of your not taking

6  the witness stand and testifying, and the Court of course will

7  handle it that way itself, if you do want to take the witness.  I

8  certainly would not draw an adverse inference against you as a

9  result of your failure to testify in the case.  There would be no

10 inference of guilt simply because of the fact you did not testify.

11 But it can be very important for people to testify, and that's a

12 judgment call for you and your lawyer, but basically for you, after

13 you've discussed it and thought about it fully with your lawyer.

14      In spite of the instructions about drawing no inference

15 against an individual, if he or she does not testify, I'm sure that

16 lay jurors always think about that and that it has an impact on

17 them.  From the standpoint of the Court, I well understand why

18 people do not take the witness stand and testify in given cases and

19 I fully understand why you would not do so.  That could be one of

20 the reasons Mr. Sadow and you decided that you should try this case

21 before the Court without a jury.  That would be something that I

22 would consider seriously if I were defending an individual in any

23 case, but particularly a case where I thought that my client might

24 get a better view of his or her position with a judge rather than a

25 jury.  But, again, I keep repeating it, it's your call, you have to

1  make that decision.

2           So why don't you speak to your lawyer a moment, you can

3  do it here or we can take a break, whichever you prefer, and then

4  you can tell me whether or not you want to not testify.

5           MR. SADOW:  Your Honor, we do not need to take a break.

6  I believe that the defendant is ready to answer the Court's

7  inquiry.

8           THE COURT:  All right.  What is your position then,

9  Mr. Nickel?

10          THE DEFENDANT:  Your Honor, I decline to testify.

11          THE COURT:  All right.  Fine.

12          Are you going to have any other evidence?

13          MR. SADOW:  No, we have no evidence, Your Honor.

14          THE COURT:  Well, what do you want to do about this

15  case?  Do you all want to file -- in fact, the Court would

16  appreciate having findings and conclusions in this particular case.

17  Do you want to argue the case?

18          MR. SADOW:  Well, I want to do whatever's going to be in

19  the Court's best interest because you're the trier of fact here.

20          I know it has been mentioned about filing legal briefs

21  based on the facts and the law, and I don't have any problem with

22  that.  I also sometimes would like the opportunity to of course

23  make the argument.  So let me just throw this out as a potential

24  idea.

25          I'm assuming that the Government would file its argument

1   first and I would respond to the Government's argument and then the

2   Court could let us know whether, in light of that, the Court would

3   deem it helpful or potentially to assist the Court to have a

4   closing argument.  If the Court says yes, that's fine.  If the

5   Court says no, that is fine as well.  I'd like to be able to do

6   that after we have a transcript.  We can order the transcript so

7   that there's no question about what the facts have been said.  I

8   put that forth as a potential solution.  I've not discussed it with

9   Government, so I don't know what ...

10          THE COURT:  Well, that's fine with me.  If you want to

11  briefly state what your position is and what you feel about the

12  evidence before you proceed further, I'll be glad to hear from you.

13  I'm not in any way suggesting that you not argue the case.  And I'm

14  talking to the Government as well as you.  There may be 5 or 10

15  minutes of argument that each of you would like to make before we

16  recess this case and then follow your suggestion, if that suits the

17  Government.

18          MR. JONES:  That proposal is fine, Your Honor.  We're

19  also fine with -- Mr. Sadow said he assumed the Government would go

20  first.  I'm not sure if we would also -- normally in closing

21  argument we get rebuttal as well.  I'm not sure if the Court would

22  allow us to file a responsive brief to whatever Mr. Sadow files.

23          MR. SADOW:  And I have no objection to that.  That would

24  be correct, normally they would have the right to rebuttal.

25          MR. JONES:  But the -- and we're happy just to go

1  forward with the briefs, just, you know, wait for the transcript,

2  look at that and file our briefs.

3          I think Mr. Sadow was saying that if it were -- if it

4  would benefit the Court, once the briefs -- if I understood his

5  suggestion correctly, once briefs were filed, if the Court thought

6  it was of further benefit to have the parties come back and present

7  a closing argument, that's what we can do.  The Government's also

8  prepared to give just a sort summation.  It sounds like Mr. Sadow

9  might be ready to do that also.  But it's just basically going to

10 be what we said -- I think what both parties set out in opening,

11 which is our view of the statute.

12         THE COURT:  Well, if you want to make a brief summary of

13 what you think the position is, I'll be glad to hear from you.  Why

14 don't you speak briefly about what your position is and then we can

15 let you get the transcript, submit your proposed findings and

16 conclusions, then we can look at them, and if it will help the

17 Court, I'll have you come back and argue further.  But if you want

18 to briefly state what your position is, now that the evidence is

19 in, I'll be glad to hear from you.

20         MR. SADOW:  Your Honor, I'll make it brief because one

21 thing I do know -- I don't have to tell this Court probably even

22 once, but certainly not more than once --

23         THE COURT:  No.

24         MR. SADOW:  -- what the facts and the law might be in

25 this situation.

1          As I said in my opening, and just to briefly reiterate,

2   the key here is looking to see whether the chats and the language

3   being used by the defendant and the intent of the defendant is an

4   attempt to persuade, induce, entice, or coerce an individual, a

5   minor, to engage in sexual activity.

6          I believe that the language in the chats here does not

7   indicate an attempt to persuade, induce, entice.  I don't think

8   it's a question about coercion.  I think we're talking about

9   persuasion, enticement, and inducement.  And I say that because

10  almost all of the conversation is just that, it is conversation.

11  This statute doesn't criminalize solicitation.  If it criminalized

12  solicitation -- that is, if it was an attempt to solicit an

13  individual to engage, I'd say we were much, much closer, because

14  clearly the defendant brings up the subject matter, the defendant

15  is the one that discusses it in graphic terms.

16          But there is never a reluctance in the overall tone of

17  the chats or a resistance or unwillingness to have this

18  conversation.  It gives the feeling -- and again, you know,

19  obviously on behalf of the defendant -- and I'm using the

20  colloquial language here.  If one listens to this, it's almost like

21  the defendant gets off on the conversation and the exchange of

22  pictures, that it was not designed to get to the sex in real terms

23  with this individual.

24          I think -- in some ways, I think that Chicago tends to

25  prove that by showing, if you compare the sexual acts discussed and

1  the way they're discussed in Illinois, are more along the lines of

2  inducement and enticement than they are in our case.  The defendant

3  never shows and he doesn't send any pictures.  It's almost like

4  whatever the person he's speaking to, whatever that leads to in

5  conversation, he goes with.  But we do have the travel.  So I can't

6  make the argument that there wasn't some follow through.  But I

7  don't think you see an effort to take the wheel, overcome the will

8  to even persuade or entice or induce this particular undercover

9  minor.

10       I used in some of my questions -- I know the Court

11  picked up on it.  When I asked the undercover agent whether he

12  attempted to persuade or entice or induce the defendant to make a

13  statement, and he said no, no, no, I just want to talk with him.

14  Folks, that's exactly what we're talking about here.  If what he

15  did wasn't the attempt to persuade, induce, or entice, I don't

16  think the defendant either.  It was more just to open up the

17  conversation which took place.

18       I think if the statute wanted to read as the Government

19  wants the evidence to be, which is that just a conversation, or the

20  solicitation, is enough or if it's just adult to minor is enough,

21  then there would be a conviction.  As I said, there are other

22  federal statutes that may well apply.

23       I'd also point out that, strangely enough, under Georgia

24  law, which of course this was an investigation under Georgia law,

25  when you look at the sexual exploitation statute, it deals with the

1   solicitation, and I think there's a difference here between

2   soliciting something or actually attempting to persuade, entice, or

3   induce.

4         There was nothing offered.  There was no money.  There

5   was nothing else given.  As close as you're going to get to that

6   was "We can go out to dinner and have Italian and maybe go swimming

7   in the pool."  I don't think that that falls along the lines of

8   it's used to entice or induce someone to engage in sex.

9         And it was throughout the conversation essentially "You

10  don't have to do something that you don't want to do.  I don't want

11  to pressure you.  I don't want to make you do what you're not

12  comfortable doing."  I think as a result, we just have the wrong

13  statute, which is very clearly wrongful conduct and should have

14  been prosecuted maybe under something else.

15        Sometimes, respectfully, the Government gets a little

16  greedy, and the 10-year mandatory minimum here for this statute is

17  the reason we're before the Court on it.  The other statutes do not

18  carry mandatory minimum sentences.

19        THE COURT:  Thank you for your thoughts, Mr. Sadow.

20        Ms. McBath.

21        MS. McBATH:  The facts here are undisputed, Your Honor.

22  The issue we have is a very narrow one, and that is whether or not

23  the defendant's actions constituted persuasion, inducement, or

24  enticement under the statute.

25        The defendant said in his opening that communication

1   alone is not enough and he concedes that if communication alone is

2   enough to violate the statute, then they lose.  The defendant's

3   argument fails because communication actually is enough.  It is not

4   the sex act itself that 2422 proscribes.  It's actually -- it's the

5   talk.  It's the persuasion.  Here the persuasion, the inducement,

6   and the enticement is the language that the defendant himself used

7   while communicating with Cari on the computer.  He said the sex --

8   he described the sexual things he wanted to do to her.  He

9   described the sexual things that he wanted her to do to him.  It

10  was this talk that was the persuasion.

11          He asked about her sexual experience no fewer than seven

12  times.  He asked Cari to describe her body.  He asked her to

13  describe her own genitalia.  He asked her to comment on his

14  genitalia no fewer than seven times.  He tells Cari what he wants

15  to do to her sexually, what he wants her to do to him sexually no

16  fewer than five times.

17          But this Court doesn't actually have to answer that

18  question, whether communication alone is enough, because here we

19  have a lot more than communication.  We also have pictures that

20  were provided.  The defendant asked for pictures of Cari no fewer

21  than 18 times during the course of these communications.  The

22  defendant asked about or sends pictures to Cari no fewer than 9

23  times.  He sends a picture of an erect penis.  He sends a picture

24  showing pubic hair exposed.  He sends a picture with a naked torso.

25          And he also, in addition to the pictures, arranged to

1  travel.  He spoke on no fewer than 13 separate discussions -- had

2  no fewer than 13 separate discussions on these travel logistics.

3        In *United States vs. Hornaday*, which is found at 392 F3d

4  1306, the Eleventh Circuit found that the communications via email,

5  the photographs exchanged, and in the telephone conversation -- and

6  here we also have a telephone conversation -- that those three

7  things establish, and I quote, "Every element of 2422(b) several

8  times over."

9        Here we have even more.  We have actual travel.  The

10  defendant showed up at the arranged meeting place and we have

11  404(b) evidence that shows the defendant's intent to persuade.

12        The defendant argues here on closing that there was

13  never a reluctance on the part of Cari.  But that argument is

14  misguided because this is not about the victim.  It's about the

15  defendant's conduct.  And the defendant's argument rests on this

16  assumption that the statute was designed to protect only those

17  minors who want their virtue to remain intact.  The statute was

18  designed to protect minors, period, to protect minors.

19        And you also can't forget the context here.  We're

20  talking about a 30-year-old male who believes he's talking to a

21  14-year-old girl.  The power difference is enormous already.  And

22  you cannot expect a minor to say these magic words of "I'm not

23  persuaded, you're going to have to convince me."  Minors, girls

24  tell adults what they think that adults want to hear.

25        And even if Cari opened the door, it was the defendant,

1  it was the adult who walked boldly through that door.  He walked

2  through that door, he engaged in graphic, lewd sexual discussions

3  with a person he thought was a 14-year-old girl.  He gave graphic

4  sexual pictures to a girl and he traveled.  It was the defendant

5  who traveled.  So the elements of 2422(b) have been met several

6  times over.

7          The Eleventh Circuit has seen this exact factual

8  scenario many times.  *United States vs. Murrell*, *United States vs.*

9  *Hornaday*, *United States vs. Root*, *United States vs. Panfil*.  The

10  case law is clear, the facts are clear, the defendant is guilty.

11  That's all I have, Your Honor.

12          THE COURT:  Well, thank you, Ms. McBath.

13          All right.  After you receive the transcript, how much

14  time do y'all want?

15          MR. JONES:  The Government would ask for 10 days or two

16  weeks, Your Honor.

17          THE COURT:  Why don't we give you two weeks after your

18  receipt of the transcript.

19          Is that all right for you also, Mr. Sadow?

20          MR. SADOW:  Am I getting two weeks after the Government

21  files its brief on the transcript?

22          THE COURT:  No, no.  I was expecting both of you to file

23  them at the same time; that is, the last day that I give you.

24          MR. SADOW:  If that's what you're expecting, then that's

25  what I'm going to be doing.

1              The only problem that I might have, and I'll make it --

2    I am due to start a rather lengthy hearing in a case in California

3    on October the -- on the 13th.  It could take more than a couple

4    weeks, it's not supposed to, but nothing seems to run on time in

5    California.

6              THE COURT:  No, no.  They try cases for six months and a

7    year out there.

8              MR. SADOW:  Unfortunately, I'm afraid that's what this

9    one is going to be.

10             THE COURT:  Anyway, if you need more time than that for

11   either of you, if you get in a long trial, you can just notify us

12   and we'll take care of you timewise.

13             I commend all of you on your competency in presenting

14   this case.  I include the defense, Mr. Sadow.

15             MR. SADOW:  That's kind of you, Your Honor.

16             THE COURT:  Even though you didn't put up any evidence.

17             All right.  We'll be in recess.

18             THE CLERK:  All rise, please.  This Honorable Court's in

19   recess until further order.

20                  [proceedings concluded at 4:21 p.m.]

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF GEORGIA

3  CERTIFICATE OF REPORTER

4

5          I do hereby certify that the foregoing pages are a true

6  and correct transcript of the proceedings taken down by me in the

7  case aforesaid.

8          This the 2nd day of November, 2009.

9

10

11          _____

           ALICIA B. BAGLEY, RMR, CRR
12          OFFICIAL COURT REPORTER
           (706) 378-4017
13

14

15

16

17

18

19

20

21

22

23

24

25